ESTATE OF DORA N. MARSHALL, DECEASED, CHARLES D. MARSHALL, AIKEN W. FISHER, AND CONTINENTAL BANK AND TRUST COMPANY, EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 147–67, 1178–68. Filed February 4, 1969.

*Paul G. Rodewald* and *James G. Park*, for the petitioners.
*Albert J. O'Connor*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' estate tax in docket No. 147–67 in the amount of $1,055,558.70 and in petitioners' gift tax in docket No. 1178–68 in the amount of $66,565.92, plus an addition to the gift tax of $16,641.48 under section 3612(d)(1) of the Internal Revenue Code of 1939.

Certain issues have been settled, and the addition to the gift tax has been conceded by respondent. The only issue remaining in the estate tax case is whether, within the meaning of section 2036,[1] decedent

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

made a transfer of property after March 3, 1931, retaining a life interest therein, in connection with the creation of two trusts on March 10, 1931, and March 17, 1931. The sole issue in the gift tax case is whether decedent's release on January 26, 1943, of general testamentary powers of appointment given to her under these trusts, constituted a taxable gift within the meaning of section 1000 of the Internal Revenue Code of 1939.

FINDINGS OF FACT

All the facts have been stipulated and are so found.

Petitioners in both proceedings are the executors of the Estate of Dora N. Marshall (referred to herein as Dora or decedent), who died January 22, 1964, a resident of North Coventry Township, Chester County, Pa. The address of the petitioners is 205 High Street, Pottstown, Pa. 19464. The estate tax return was filed with the district director of internal revenue at Philadelphia, Pa., on April 21, 1965. The notice determining the deficiency in estate tax was mailed to petitioner on October 14, 1966.

The notice determining the gift tax deficiency for the year 1943 was mailed to petitioners on February 1, 1968. On March 8, 1968, the petitioners filed a gift tax return for the year 1943 with the district director of internal revenue at Philadelphia, Pa., in whose district the decedent resided in 1943, reporting the release of the testamentary powers of appointment upon which the respondent based the asserted gift tax deficiency, and claiming that no taxable transfer was made by such release.

The controversies as to both the estate and gift tax deficiencies stem from the creation of two trusts, on March 10, 1931, and March 17, 1931, by decedent's husband, Charles D. Marshall (hereinafter Charles). Prior to December 31, 1930, Dora owned 2,883 shares of stock of McClintic-Marshall Corp. (hereinafter McClintic). Six of the children of Charles and Dora and a brother of Charles each owned 323 shares of McClintic. In December 1930 Charles told Dora, the children, and his brother that in order to consummate a pending acquisition of McClintic by Bethlehem Steel Corp. it was necessary for him to control all the McClintic stock which they owned. He told them that if they would transfer the stock to him, he would see that proper restitution was made and that they would suffer no loss. Dora, the children, and the brother agreed to this arrangement and, on or about December 31, 1930, transferred their McClintic shares to Charles.

On February 23, 1931, Charles prepared a memorandum acknowledging that he owed Dora $374,790—the value of the stock she had transferred to him. At or about that time, Charles submitted to Dora

and the children the texts of two trust instruments which he subsequently executed, and asked them whether the trust provisions would be satisfactory restitution for the stock they had transferred to him. They replied in the affirmative.

On March 10, 1931, Charles executed a trust indenture and transferred certain property to the Union Trust Co. of Pittsburgh (now Mellon National Bank & Trust Co.), the trustee named therein. On March 17, 1931, Charles executed another trust indenture and transferred certain property to the Fidelity Trust Co. (now Pittsburgh National Bank), the trustee named therein. The property placed in trust under these instruments consisted of stocks and bonds of various corporations, not including McClintic, as well as cash.

Under each of these trusts, the property was divided into 18 shares. Pertinent to the present controversy, the income of 6 shares of each trust was made payable to Dora. She was also given general testamentary powers of appointment over their corpora, subject to the proviso that, in default of such appointment, the property would be distributed to such persons as would be entitled thereto under the intestate laws of Pennsylvania had she died seized and possessed of the trust estate. Respondent has determined that, although Charles was the ostensible settlor of the trusts, Dora was in reality one of the settlors, and has included the corpora in her gross estate under section 2036. Dora released the testamentary powers of appointment on January 26, 1943, and respondent has determined that she thereby incurred gift tax liability under section 1000 of the Internal Revenue Code of 1939.

The fair market value of the shares of McClintic stock transferred to Charles by Dora on December 31, 1930, was $374,790. The aggregate fair market value of the trust property in which Dora was given a life estate and powers of appointment, was $616,021.66 at the time the trust indentures were executed; $442,054.21 on the date of her release of the testamentary powers; and $1,605,289.96 (after reflecting termination expenses of $19,235) on the date of her death on January 22, 1964. Dora received income distributions from the inception of the two trusts to the date of her death in the aggregate amount of $1,002,551.91.

#### ULTIMATE FINDINGS OF FACT

Dora made a transfer in trust with a retained life interest after March 3, 1931, to the extent of $374,790. She received consideration therefor in the amount of $241,231.66.

Dora's release in 1943 of her reserved testamentary powers of appointment was not a taxable gift.

OPINION

## Estate Tax

Section 2036 [2] requires the inclusion of property in a decedent's gross estate where the decedent has made an inter vivos "transfer" of any interest in that property, and has "retained" for his life the right to the income therefrom. Excepted are transfers made before March 4, 1931, and transfers made for "adequate and full consideration in money or money's worth." Stated simply, the purpose of the section is to impose an estate tax with respect to property which a decedent transferred during his life but in which he retained the right to economic benefit until his death. *First National Bank of Shreveport* v. *United States*, 342 F. 2d 415, 416–417 (C.A. 5, 1965) (per curiam); *Greene* v. *United States*, 237 F. 2d 848, 852 (C.A. 7, 1956); Warren & Surrey, Federal Estate and Gift Taxation 257 (1961). The taxability of a transfer under section 2036 is not determined by the refinements of conveyances or the technicalities of contracts or trust indentures, but by the substance and practical effect of what was done. See *Helvering* v. *Hallock*, 309 U.S. 106, 112, 114 (1940).

Petitioners contend that Dora made no "transfer," within the meaning of section 2036, after March 3, 1931—that the only transfer she made was of her shares in McClintic to Charles in December 1930, prior to the effective date of section 2036; that Charles, not Dora, made the transfers in trust; and that Dora did not, therefore, "retain" the income from the trusts for her life. On these grounds, petitioners maintain that section 2036 does not apply.

In evaluating the merits of petitioners' arguments we do not write upon a blank slate. After Charles' death on May 16, 1945, the Commissioner sought, under 1939 Code section 811(c), as amended, to include in Charles' gross estate the remainder interests in the two trusts, on the ground that Charles had retained a possibility of re-

---

[2] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

(b) LIMITATION ON APPLICATION OF GENERAL RULE.—This section shall not apply to a transfer made before March 4, 1931; nor to a transfer made after March 3, 1931, and before June 7, 1932, unless the property transferred would have been includible in the decedent's gross estate by reason of the amendatory language of the joint resolution of March 3, 1931 (46 Stat. 1516).

verter [3] in the property. This Court rejected the Commissioner's determination, holding that the reversionary interests, if any, arose not "by the express terms of the instrument of transfer," as required by 1939 Code section 811(c)(2), but "by operation of law," and that the property, therefore, was not includable in Charles' estate. *Estate of Charles D. Marshall*, 16 T.C. 918 (1951). In affirming, the Court of Appeals noted that the Commissioner did not challenge this Court's finding that "the trusts were created in consideration of and as restitution for the $374,790 stock" which Dora transferred to Charles in December 1930; accordingly, that court treated the Commissioner's claim as having been reduced "in consonance with the determined consideration under * * * [the predecessor of section 2043] which provides that the value of the property includible must be reduced by the value of consideration received for the transfer by the settlor-decedent." *Commissioner* v. *Marshall's Estate*, 203 F. 2d 534, 537 (C.A. 3, 1953). This reasoning, based as it is on facts almost identical with the stipulated facts before us, establishes that Charles created the trusts to satisfy Dora's debt claim against him for the McClintic stock.[4]

In the light of this prior holding, we cannot agree with petitioners that Dora did not, in substance, make a "transfer" to the trusts within the meaning of section 2036. When Charles asked Dora to transfer her McClintic stock to him, he promised that "he would see that proper restitution was made" to her and that she "would not suffer by it." Dora "agreed to this arrangement."[5] On February 23, 1931, Charles prepared a memorandum acknowledging that he owed Dora $374,790. Instead of receiving payment of this debt claim against Charles, she agreed to relinquish that claim in consideration of Charles' creation of the trusts from which she was to receive the income for life. The net effect, for all practical purposes, was the same as if Charles had

---

[3] Upon failure by Dora to exercise her general testamentary powers of appointment over the trust corpora, the property was to pass under the intestate laws of Pennsylvania as if she had died seized and possessed of it. Under the Pennsylvania intestate laws as they then stood, Charles would have been entitled to receive one-third of the property.

[4] On brief petitioners assert that "Nobody, not the executors of Mr. Marshall's estate, not the Commissioner, not the Tax Court, not the Court of Appeals for the Third Circuit, suggested, as the Commissioner claims now, that Mrs. Marshall, not her husband, was the true settlor of these trusts." This is not quite accurate. A dissenting opinion expressly noted, but did not pass on, "the effect that should be given to the fact that, to some extent, the trust corpus was in effect supplied by his wife." 16 T.C. at 924. In any event, our problem here is to assess the legal consequences of the creation of the trusts—pursuant to a prearrangement between Charles and Dora—in satisfaction of Dora's debt claim, a question different from that involved in the earlier proceedings and one that was not presented therein.

[5] The stipulated fact is as follows:

"In December, 1930, prior to Christmas, Charles D. Marshall told his wife (the decedent) and his two sons that * * * if they would transfer their McClintic-Marshall stock to him, he would see that proper restitution was made to them; that they would not suffer by it. Dora N. Marshall (the decedent), the six children and the brother agreed to this arrangement and accordingly, on or about December 31, 1930, they transferred to Charles D. Marshall their certificates for shares of the second preferred stock of McClintic-Marshall Corporation in the amounts above stated."

actually paid $374,790 to her and she had thereupon transferred that amount to the trusts. Although Charles was nominally the sole settlor, he was, in substance, Dora's agent in creating the trusts to the extent of the $374,790. See *Estate of Grace D. Sinclaire*, 13 T.C. 742, 746 (1949); [6] 3 Mertens, Law of Federal Gift and Estate Taxation, sec. 21.05. We think that Dora's relinquishment of her debt claim in consideration of the creation of the trusts constituted a "transfer" by her within section 2036.

Petitioners argue, however, that section 2036 does not apply because Charles, not Dora, transferred *his* property, not hers, to the trusts. But tax consequences, like many other legal and economic consequences of a transaction, attach to the real party in interest. *Estate of Grace D. Sinclaire, supra.* Nothing in section 2036 requires an empty ritual whereby the debtor, in this case Charles, would first physically transfer title to the property to the creditor, Dora, so that the latter could then convey that property to the trusts. It is well established that "A person who furnishes the consideration for the creation of a trust is the settlor, even though in form the trust is created by another person." 2 Scott, Trusts, sec. 156.3, pp. 1201–1202, 1203–1204 (3d ed. 1967); *Lehman* v. *Commissioner*, 109 F. 2d 99, 100 (C.A. 2, 1940), affirming 39 B.T.A. 17 (1939), certiorari denied 310 U.S. 637 (1940); cf. *Estate of Henry Goelet*, 51 T.C. 352 (1968).

This principle has been applied in a variety of factual settings. See, e.g., *Estate of Fannie Bomash*, 50 T.C. 667, 673 (1968), on appeal (C.A. 9, Dec. 30, 1968); *Union Commerce Bank*, 39 T.C. 973 (1963), affirmed on this issue 339 F. 2d 163 (C.A. 6, 1964); *Estate of Grace D. Sinclaire, supra; Estate of Cornelia B. Schwartz*, 9 T.C. 229 (1947); *Estate of George W. Sweeney*, 4 T.C. 265 (1944), affd. 152 F. 2d 102 (C.A. 2, 1945); *Blackman* v. *United States*, 98 Ct. Cl. 413, 48 F. Supp. 362 (1943). In *Sexton* v. *United States*, 300 F. 2d 490 (C.A. 7, 1962), certiorari denied 371 U.S. 820 (1962), decedent, a beneficiary of both the income and corpus of a trust scheduled to expire on a certain date, agreed to consecutive extensions of the trust to a date prior to which she died; and, although not a settlor of the original trust, she was held to have made transfers of property by agreeing to the extensions. The court (p. 493) explained the principle as follows:

Decedent affirmatively relinquished her right to receive her share in the corpus and thereby is considered to have made a transfer of her property interest in the corpus. The transfer was with a retained interest—an interest in the income of the trust for her life. This is sufficient to make the transfer includible in decedent's gross estate under Section 2036.

---

[6] In *Sinclaire*, this Court rejected the argument, also made here, that the initial transfer was unconditional and independent of the subsequent transfer in trust.

Accord, *Estate of Anna Hart Kinney*, 39 T.C. 728, 731 (1963). Similarly, Dora relinquished her right to be paid for her McClintic stock in consideration of the creation of the trusts from which she was to receive the income for life, and is, therefore, deemed to have made a transfer of her property within the meaning of section 2036.

Petitioners would have us distinguish this line of cases on the ground that in each of them the decedent once owned or was entitled to receive the *precise* property which became the trust corpus. But the principle is not so limited. It applies with equal force where the arrangement substitutes one property for another of equal value. In *Glaser* v. *United States*, 306 F. 2d 57 (C.A. 7, 1962), decedent and his wife conveyed a parcel of land to their daughter and her husband. As consideration for the conveyance, the daughter and her husband conveyed land of equal value, referred to as parcel VII, to decedent and his wife for their joint lives with remainder over to one of decedent's sons. Holding parcel VII includable in decedent's gross estate, the court said (p. 61) :

Looking through form to substance * * * decedent and his wife merely substituted one piece of property for another of equal value. The effect of the exchange of properties was a transfer of parcel VII * * *. The transaction, therefore, should be treated for federal tax purposes as if the transfer of parcel VII had emanated from decedent and his wife and as if they had retained joint life interests therein. * * *

Also see *Lehman* v. *Commissioner, supra; Moreno's Estate* v. *Commissioner*, 260 F. 2d 389 (C.A. 8, 1958), affirming 28 T.C. 889 (1957) ; *Hanauer's Estate* v. *Commissioner*, 149 F. 2d 857, 859–860 (C.A. 2, 1945), affirming a Memorandum Opinion of this Court, certiorari denied 326 U.S. 770 (1945) ; but see *Estate of Grace* v. *United States*, 393 F. 2d 939 (Ct. Cl. 1968), certiorari granted December 9, 1968.

In summary, looking at the substance and practical effect of what was done, it is clear that Dora made a transfer and retained the income from the transferred property for life. Immediately prior to the formation of the trusts Dora's estate included an asset in the form of a debt claim against Charles for $374,790. Creation of the trusts depleted Dora's estate by the amount of the debt and permitted her to retain for her life the right to economic benefit of property at least equal in value to her debt claim. Upon her death the property was to pass to the next generation. This is precisely the kind of transfer of wealth to which section 2036 was intended to apply.

Respondent concedes that Dora's contribution to the trusts did not exceed 60.84 percent of the total amount placed in trust (i.e., the ratio of the debt claim of $374,790 to the value of the trusts when created,

$616,021.66). Accordingly, under section 2043(a),[7] the amount includable in her gross estate is the date of death value of the assets in which she "retained" a life interest when the trusts were created, $976,658.41 (60.84 percent × $1,605,289.96, the value of the trusts at the time of her death) less the date of transfer value of the consideration she received, $241,231.66 (the excess of the March 1931 value of the trust corpora, $616,021.66, over the amount contributed by her, $374,790), or $735,426.75. See *Estate of Howard Lee Davis*, 51 T.C. 269 (1968).

Petitioners contend, however, that since Dora received a life estate plus a general testamentary power over the entire trust corpora, not merely over the amount not contributed by her, the consideration received by her should include the amounts she contributed to the trusts, and hence was "adequate and full," within the meaning of section 2036. But we have held that Dora in substance made the transfer in trust; and the retention of a life estate in one's own property cannot be counted as consideration received for a transfer. *United States* v. *Gordon*, 406 F. 2d 332 (C.A. 5, 1969); *Estate of Lillian B. Gregory*, 39 T.C. 1012, 1017 (1963).

Relying upon a District Court opinion in *Righter* v. *United States*, 258 F. Supp. 763 (W.D. Mo. 1966), petitioners argue alternatively that the consideration received by Dora should be measured by the income ($1,002,551.91) she received from the trusts;[8] however, the Eighth Circuit Court of Appeals recently reversed the District Court and held, consistent with the conclusion stated above, that the consideration must be valued as of the transfer date and, therefore, does not include any amount of income received thereafter. *United States* v. *Righter*, 400 F. 2d 344 (C.A. 8, 1968); see *United States* v. *Gordon*, *supra* at 344 fn. 19; cf. *Estate of Howard Lee Davis*, *supra*, and cases cited. We believe respondent has correctly computed the amount includable in decedent's gross estate as $735,426.75.

## Gift Tax

Respondent determined that Dora made a taxable gift in the amount of $322,045.52 when she released her testamentary powers of appointment in 1943. Consistent with the concession that Dora contributed

---

[7] SEC. 2043. TRANSFERS FOR INSUFFICIENT CONSIDERATION.

(a) IN GENERAL.—If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

[8] Petitioners point out that even if we exclude the income from 60.84 percent of the trust (the percentage of the trust Dora contributed), the income received from the remaining portion ($392,595.32) exceeds her contribution ($374,790).

only 60.84 percent of the corpora of the two trusts, however, respondent admits on brief that the gifts did not exceed $190,195.77.[9] It is respondent's position that Dora's gratuitous release of the powers she reserved over the trust corpora constituted a taxable gift. *Estate of Sanford* v. *Commissioner*, 308 U.S. 39 (1939). Respondent acknowledges that 1939 Code section 1000(c)(1)[10] exempts from gift tax the release of a general power of appointment created prior to October 21, 1942, but points out that this section does not apply to a reserved, as distinguished from a donated, power of appointment. See H. Rept. No. 2586, 77th Cong., 2d Sess., p. 71 (1942), 1942–2 C.B. 701, 726; sec. 25.2514–1(c)(2), Gift Tax Regs.; sec. 86.2(b)–2, Regs. 108, as amended by T.D. 6077, 1954–2 C.B. 308, 312; cf. *Estate of Mary Lois K. McIntosh*, 25 T.C. 794, 804 fn. 2 (1956), affd. 248 F. 2d 181 (C.A. 2, 1957), certiorari denied 355 U.S. 923 (1958).

Petitioners urge here, as they did with respect to the estate tax issue, that Dora was not a cosettlor of the trusts and, therefore, her powers of appointment were not reserved but donated powers, with the result that 1939 Code section 1000(c)(1) does apply to prevent the imposition of a gift tax on their release. We must reject this argument for the reasons stated above in our discussion of the estate tax liability.

However, petitioners also contend, correctly we believe, that Dora's release of her testamentary powers was exempt from gift tax under the special relief provisions of 1939 Code section 1000(e).[11] This section applies to pre-1939 trusts under which the grantor retained control over the distribution of the trust property. It provides that the grantor's relinquishment, between 1940 and 1947, of such control will not be deemed a taxable gift if he possessed "no power to revest title to such property in [himself]." Applying this section in *Estate of*

---

[9] Respondent computes this figure by applying the percentage of Dora's contribution to the trusts (60.84) to the stipulated value of the trust corpora on Jan. 26, 1943, the date of the release ($442,054.21), arriving at a figure of $268,945.78. This last figure is then multiplied by the remainder factor for one of her age (0.70719), taken from sec. 86.19(g), Regs. 108, as amended by T.D. 5902, 1952–1 C.B. 167, 170. The computation is as follows: $442,054.21 × 0.6084 × 0.70719 = $190,195.77.

[10] SEC. 1000. IMPOSITION OF TAX.

    (c) POWERS OF APPOINTMENT.—

       (1) EXERCISE OF GENERAL POWER OF APPOINTMENT CREATED ON OR BEFORE OCTOBER 21, 1942.—An exercise of a general power of appointment created on or before October 21, 1942, shall be deemed a transfer of property by the individual possessing such power; but the failure to exercise such a power or the complete release of such a power shall not be deemed an exercise thereof.

[11] SEC. 1000. IMPOSITION OF TAX.

    (e) CERTAIN DISCRETIONARY TRUSTS.—In the case of property in a trust created prior to January 1, 1939, if on and after January 1, 1939, no power to revest title to such property in the grantor could be exercised either by the grantor alone, or by the grantor in conjunction with any other person not having a substantial adverse interest in the disposition of such property or the income therefrom, then a relinquishment by the grantor on or after January 1, 1940, and on or before December 31, 1947 (or on a later date in any case where it is shown to the satisfaction of the Commissioner, in accordance with regulations prescribed by him with the approval of the Secretary, that failure to relinquish prior to such later date was for reasonable cause), of power or control with respect to the distribution of such property or the income therefrom by an exercise or other termination of such power or control shall not be deemed a transfer of property for the purposes of this chapter. * * *

*Ellie G. Canfield*, 34 T.C. 978, 983 (1960), acq. as to this issue 1963–1 C.B. 3, affd. on another issue 306 F. 2d 1 (C.A. 2, 1962), this Court held that the release by the decedent in that case on December 15, 1942, of a general testamentary power of appointment, reserved under a trust created by her in 1919, was exempt from gift tax because she did not have power to revest the trust property in herself. We construed the phrase "power to revest title to such property in the grantor," as used in 1939 Code section 1000(e), to refer to the power of the decedent-grantor to regain title to the property *during her lifetime*, not merely to the testamentary power to appoint to her own estate. 34 T.C. at 981.

Respondent urges us to distinguish the *Canfield* case on the ground of a difference in controlling State law: New York law controlled the construction of the *Canfield* trusts whereas Pennsylvania law controls here. The issue thus resolves itself into the question whether the present trust instruments,[12] interpreted under Pennsylvania law, empowered Dora to revest the trust corpora in herself during her lifetime.

In support of his position that Dora was so empowered, respondent cites a line of cases beginning with *Lyon* v. *Alexander*, 304 Pa. 288, 156 Atl. 84 (1931), which held that a life tenant holding a general testamentary power of appointment could convey fee simple title to the property to a third party. However, the deed in that case was not executed by the life tenant alone. The contingent remaindermen who would have taken in default of the exercise of the power joined in the conveyance. Thus, as the Pennsylvania Supreme Court subsequently explained, "the extinguishment [of the power in *Lyon*] was a confirmation and not a destruction of the interests of the remainderman [sic]." *McCreary's Estate* v. *Pitts*, 354 Pa. 347, 349, 47 A.2d 235, 237 (1946).

Indeed, contrary to respondent's contention that *Lyon* supports his position, that case is but an example of a rule that has been consistently applied in Pennsylvania: A trust can be terminated only with the consent of all the parties beneficially interested in the trust, including contingent remaindermen whether or not they are yet in existence or are ascertainable.[13] See, e.g., *Hauptfuhrer's Estate* v. *Commissioner*,

---

[12] The vital language is Paragraph Fourth, identical in both instruments:

"Upon the death of DORA NOBLE MARSHALL, wife of the Donor, the trust shall terminate as to her six equal shares of principal, and the trustee shall pay over and distribute the same in such manner and in such proportions as she shall by her last will and testament direct, limit and appoint, and in default of such appointment, shall pay over and distribute the same to such person or persons as would be entitled thereto under the intestate law of the State of Pennsylvania if she had at that time died seized and possessed of the trust estate."

[13] This is also the rule of Restatement, Second, Trusts, see 340(1) (2d ed.). Comment of and illustration 6 in the Reporter's Notes to this section are of particular relevance to the question before us.

195 F. 2d 548, 551 (C.A. 3, 1952), affirming a Memorandum Opinion of this Court, certiorari denied 344 U.S. 825 (1952) (applying Pennsylvania law) ; *McCreary's Estate* v. *Pitts, supra; Thompson* v. *Fitzgerald*, 344 Pa. 90, 94–95, 22 A. 2d 658, 660–661 (1941) ; *Lieberman* v. *Fabricant*, 59 Pa. D. & C. 443, 446 (C.P. 1946) ; cases cited in *In re Bowers' Trust Estate*, 346 Pa. 85, 29 A. 2d 519, 520 fn. 2 (1943) ; and cases cited in Comment, "Trusts-Revocation and Termination of Pennsylvania Trusts," 1 Vill. L. Rev. 122, 128 fn. 56 (1956). The decisions in *In re Curran's Estate*, 312 Pa. 416, 167 Atl. 597 (1933), and *In re Perkins' Trust Estate*, 314 Pa. 49, 170 Atl. 255 (1934), also relied on by respondent, turned on their peculiar facts and are distinguishable. See discussion of these cases in *In re Scott's Estate*, 353 Pa. 570, 572, 46 A. 2d 174, 175 (1946).[14]

The question then is whether on January 26, 1943, when Dora released her powers of appointment, was she the only person who had any interest in the trust? We think it clear that she was not.[15] The estate tax return shows that at her death in 1964, she had four daughters, a son, a granddaughter, and a grandson. They would have taken the trust corpora had Dora failed to exercise her powers and thus were contingent remaindermen under the trusts, *McCreary's Estate* v. *Pitts, supra* at 350, 351, 47 A. 2d at 238; their remainders could not have been destroyed by Dora during her lifetime, id. at 349, 47 A. 2d at 237; accord, *Collins* v. *Provident Trust Co. of Phila.*, 83 Pa. D. & C. 459, 464 (C.P. 1952) ; and she therefore could not have terminated the trust without their consent.

We conclude that Dora did not have power to revest title to the trust corpora in herself during her lifetime and that 1939 Code section 1000(e), therefore, exempts the release of the general testamentary powers of appointment from the gift tax. *Estate of Canfield, supra.*

*Decisions will be entered under Rule 50.*

---

[14] In contrast to the principle stated above regarding termination of a trust where there are more interested parties than one, the rule applied by Pennsylvania courts where there is only *one* party beneficially interested in a trust is as follows :

"If the settlor is the sole beneficiary of a trust and is not under an incapacity, he can compel the termination of the trust, although the purposes of the trust have not been accomplished."

*In re Bowers' Trust Estate*, 346 Pa. 85, 29A, 2d 519, 520 (1943), quoting Restatement, Trusts, sec. 339. See also *Schellentrager* v. *Tradesmens Nat. Bank & Trust Co.*, 370 Pa. 501, 88 A. 2d 773 (1952), which held that a recital of irrevocability does not prevent termination by the settlor-sole beneficiary.

[15] But cf. *Chase Trust*, 7 Pa. D. & C. 2d 519, 522 (Orphans' Ct. 1956). Under the rule in Shelley's Case as it existed in Pennsylvania prior to the Act of July 15, 1935, P.L. 1013, a gift to A for life, with remainder to his heirs, created an interest equivalent to a fee in real estate which was not affected by the added power to dispose of the property by will. *Chase Trust, supra* at 521–522, and Commission's Comment following Pa. Stat. Ann. tit. 20, sec. 180.16 (1950). However, the rule in Shelley's Case did not apply to personalty in Pennsylvania. *In re Hurd's Estate*, 305 Pa. 394, 158 Atl. 174, 176 (1931).