**HEGRA NOTE CORPORATION,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 24115.

United States Court of Appeals
Fifth Circuit.

Dec. 21, 1967.

E. Michael Masinter, Atlanta, Ga., for petitioner.

Lester R. Uretz, Chief Counsel, Aaron D. Trub, Atty., IRS, Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Harry Marselli, Crombie J. D. Garrett, Robert J. Campbell, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, GEWIN and AINSWORTH, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal from a decision of the Tax Court determining a deficiency in the taxpayers 1961 income tax. It draws in question the correctness of the Tax Court's holding that taxpayer's transfer of seven installment notes of the hotel corporation which it had acquired to an insurance company in exchange for certain rights in 154,000 shares of stock of the insurance company was such a disposition of the notes as to necessitate the recognition as long term capital gain under Section 453(d) (1) of the Internal Revenue Code of 1954, measured by the difference between taxpayer's basis in the installment notes and their fair market value, and whether the court was correct in finding the value of the said notes to equal 66% of their face.

The facts leading up to the transaction here in issue are complicated and involved. However, it is not necessary that they be recited because they have no bearing on the precise issue which was decided by the Tax Court and presented to us for review.

On June 29, 1960, the then holders of these seven installment notes of the Henry Grady Hotel Corporation, incorporated Hegra Note Corporation. Upon incorporation the seven installment notes, with an aggregate face value of $385,000, and an adjusted basis of $64,593.10 were the taxpayer's sole assets. They were transferred to Hegra in return for its entire capital stock. Prior to this incorporation, the incorporators had been in negotiations with Kennesaw Life and Accident Insurance Company, and an agreement had been tentatively worked out under which the seven notes (the first was to become due and payable on January 15, 1961 and was for the principal amount of $30,000; the latter six were for $59,166.66 each, due successfully one year thereafter, all bearing interest at 5% from date) would be exchanged for 154,000 shares of the common stock of Kennesaw, provided the insurance commissioner of the state of Georgia would permit Kennesaw to carry these notes as "admitted assets," thus enabling the in-surance company to increase the amount of insurance it could write.

In order to obtain this approval, the president of Kennesaw wrote the insurance commissioner expressing his opinion of the worth of the notes in the following language:

"The Henry Grady Hotel Corporation operates the well known Henry Grady Hotel at the Corner of Peachtree and Cain Streets in Atlanta. This has been for thirty years one of the City of Atlanta's best known and successful hotels. Except for a period during the depth of the depression, it has been a highly successful and profitable operation.

\* \* \* \* \* \*

"These notes represent approximately 40% of the purchase price for all of the stock of the Henry Grady Hotel Company, the balance having been previously paid in cash. Since the purchasers invested over $500,000 in the Henry Grady stock and the purchasers are men of substance and I think there is every reason to believe that the Henry Grady Hotel Corporation notes will be paid as they mature \* \* \*."

The insurance commissioner, in effect, granted conditional approval for the exchange. In his letter he said, "The notes appear to be a good credit risk," and he stated that if the 154,000 shares when issued to Hegra Note Corporation should, rather than be delivered to it, be held in escrow until the notes were paid, the whole face amount of the notes could be taken into "admitted assets" of the company. The commissioner also required that there be a clause in the agreement providing that in the event of default in a principal or interest payment exceeding sixty days, the transaction would be rescinded; Kennesaw would return all unpaid notes, together with stock representing the principal amount thus far paid on the basis of $2.50 per share; Kennesaw would then cancel the remaining escrow shares and retain all principal and interest payments made. At the time of this transaction, the Kennesaw

stock was inactively traded on the local over-the-counter market. On May 13, 1960, it was quoted at 2⅜ bid, 2⅞ asked, while on June 29, 1960, the price was 2 bid, 2¼ asked. On the date of its incorporation, Hegra entered into a contract with Kennesaw along the lines required by the insurance commissioner, and under the terms of which it transferred and assigned the notes outright to Kennesaw, in return for Kennesaw's issuing the 154,000 shares of stock and placing. them in escrow subject to the above agreement.

The Henry Grady Hotel Corporation, the maker of the notes, made the January 15, 1961, principal payment and all interest payments up to that date, but defaulted on the January 15, 1962, principal and interest payments. On January 19, 1962, the Hotel company filed a voluntary petition in bankruptcy in the federal district court under Chapter XI of the Bankruptcy Act. Kennesaw gave written notice of default to the taxpayer on February 2nd. Subsequent to this notice of default, the notes were sold for $30,000 to the Fulton National Bank, as trustee under the wills of Cecil Cannon and Fred B. Wilson (former stockholders in the old Henry Grady Hotel Company.) Thereupon Kennesaw, giving credit for the $30,000 and the $30,000 sales price, delivered 25,000 shares of its stock to the taxpayer and cancelled the rest of the stock.

The taxpayer reported its transaction with Kennesaw on its 1961 income tax return as a nontaxable exchange under Section 368(a) (1) (C) of the Internal Revenue Code of 1954. In doing so the taxpayer apparently overlooked the pro-

visions of Section 453(d) (5) that made the non-recognition provisions of the statute inapplicable as to life insurance companies. The commissioner thereupon determined a deficiency of $80,-101.72 in this return, basing his determination on Section 453(d) of the Internal Revenue Code.[1]

In the Tax Court proceedings then commenced by the taxpayer, it took the position that gain cannot be recognized under Section 453(d), it being a cash basis taxpayer and it not having received the equivalent of cash in the exchange. We think this contention is completely answered in the case of Nuckolls v. United States, (10 Cir.) 76 F.2d 357, where that court says:

"After taxpayers were accorded the privilege of postponing the tax on the gain from deferred payment sales, another move was made in the perpetual contest between the taxpayer and the taxing authorities. Many taxpayers electing to avail themselves of the installment privilege disposed of the unpaid installments, and contended, with some success, that the profit represented by the unpaid installments escaped any tax. To meet this move, Congress in 1928 passed * * * [the predecessor of Section 453(d)] above quoted. The Committee Reports to Congress (H.Rep.No. 2, 70th Cong., 1st Sess. pp. 14, 16) make the purpose entirely clear, if the language of the subsection, its context, and its history, admit of any doubt. Congress simply attached a condition to the option granted taxpayer by * * * [the predecessor of Section 453(d)] to the effect that if the taxpayer disposes of or transmits the de-

---

1. "(d) *Gain or loss on Disposition of Installment Obligations.—*

(1) *General rule.*—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received."

ferred obligations, he will pay the balance of the tax measured by the then value of the obligations. This condition is designed to plug a leak which tax counsel had discovered in a plan enacted for the benefit of taxpayers. Congress is not required by the Constitution to extend the privilege at all, as indeed it did not prior to 1926; when it did so, it had a right to attach thereto this condition. The taxpayer is not obliged to avail himself of the privilege conferred; if he does so, he takes it with the condition attached. He cannot complain that his constitutional right has been invaded by virtue of his own voluntary act in availing himself of a conditional privilege tendered him. If he does not like the condition, he need not exercise the option. * * * "

■■ It is clear that the provisions of Section 453 apply equally to a cash basis taxpayer as to one that is on an accrual basis for accounting purposes. These "installment" obligations that belonged to Hegra were "transmitted, sold, or otherwise disposed of," and thus under the precise terms of the statute "gain or loss shall result."

We think it unimportant to determine whether the transaction here was for an "amount realized in the case of * * * a sale or exchange" or was "the fair market value of the obligation at the time of * * * disposition otherwise than by sale or exchange." In either event the amount realized would represent the value of the Kennesaw stock, whereas the fair market value would represent the value of the seven promissory notes, and since the parties, dealing at arm's length, as was found to be the case by the Tax Court, were voluntarily exchanging one for the other, we think it plain that the value of the promissory notes would be the measure of the gain realized. See United States v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335.

We thus come to a question as to the correctness of the Tax Court's determination that the value of the notes trans-ferred on June 29, 1960, was 66% of the face.

Taxpayer seriously attacks the determination of value by the Tax Court. It takes the position that the only evidence of value before the court was the expert testimony presented by it, in which it was the opinion of the expert that promissory notes of large hotel corporations, such as Hilton and Sheraton, bearing a yield of 5%, would have a market value of 66% of their face amount. Based upon his study of the few operating statements and financial statements available of the operation of the Henry Grady Hotel Corporation, this witness testified that in his opinion the notes were worth not to exceed 10 to 15% of face, which would be less than the basis in the hands of the taxpayer.

■ The Tax Court accepted neither the conclusion of the commissioner that the amount realized on the disposition of the notes was an amount equal to their face value, nor the taxpayer's contention that the notes had only a nominal worth. The court was thus forced to re-determine the value of the notes. We find that there is substantial evidence in the record to support the Tax Court's redetermination that the fair market value of the installment notes was 66% of their face amount.

The Tax Court was not persuaded by the testimony of the expert, pointing out several weaknesses considered by it to cast doubt on the value of this testimony. Taxpayer, in its argument that there was no substantial basis for the finding of value, completely overlooks the significance of valuations which the parties themselves placed upon the notes at the time of their sale. It is clear that the note holders, later the incorporators and sole stockholders of the taxpayer, negotiated a sale of the notes to a Georgia life insurance company for the purpose of enabling the company to add the face value of the promissory notes to its admitted assets against which the life insurance company could then issue insurance to policyholders. While recognizing that this could not be done without

the approval of the insurance commissioner of the state of Georgia, it would be strange indeed were this same party, through its corporate organization, to be heard to say that what it undertook to transfer to the life insurance company to be used as an admitted asset of that company in the amount of $385,000, was, in fact, worthless. The relationship of the parties is not such as would work a strict estoppel to prevent such change of position by taxpayer, but the conduct of the parties is relevant to a finding by the Tax Court that the notes were worth 66% of the amount the parties were then representing them to be worth, to the public. Moreover, taxpayer introduced testimony of the president of the Kennesaw company, in which he stated, "If the notes had been obviously of no value I would think it would have been rather difficult to get such permission." (That is to have them carried at their full face value as admitted assets).

Taxpayer also introduced in evidence as part of a stipulation the letter from the insurance commissioner whose duty it was to determine whether these notes could be held out to potential policyholders as being worth $385,000. He said: "The notes appear to be a good audit risk." He thus permitted Kennesaw to enter these notes on its books at $385,000 as admitted assets, and there they remained until a default occurred some eighteen months later. While this evidence of value was not produced by the government by putting on witnesses of its own to support the commissioner's valuation figure, it was spread on the record before the Tax Court, and is there for us to consider in determining whether there was substantial evidence to support the Tax Court's finding. Moreover it is apparent that Kennesaw was willing to transfer 154,000 shares of its stock which was then having limited sales over-the-counter in Atlanta at something in excess of $2.00 per share in return for the notes, subject only to its ability to carry the notes in its admitted assets, and without placing the stock in escrow. The placing of the stock in escrow was only a requirement of the insurance com-

missioner. It does not detract from the evidentiary value to be given to the expressed willingness of Kennesaw to sell 154,000 of its shares to Hegra for the $385,000 in promissory notes as an out-and-out sale.

Obviously, a record containing this evidence sustains the decision by the Tax Court to the extent that we are not able to conclude that its determination of value was clearly erroneous.

The decision of the Tax Court is affirmed.