HAROLD W. SMITH AND CAROLINE H. SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HELEN C. SMITH, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5330–68, 3489–69. Filed May 12, 1971.

*Harold S. Voegelin* and *Richard F. Oetting*, for the petitioners. *Michael J. Christianson*, for the respondent.

274

278

## OPINION

RAUM, *Judge:* 1. In 1961 Harold and Caroline Smith sold their American Gas stock to Union Oil. The sale price finally agreed upon was $1,786,994.75, of which 459,812.13 was paid in 1961 and the balance was to be paid in annual installments over a 5-year period. On their 1961 joint Federal income tax return, the Smiths properly elected to report their gain from the sale on the installment method under section

453.[9] By the end of 1963, the unpaid balance of the total purchase price due from Union Oil was $796,309.56, and of that amount $715,710.28 represented gain to be reported by the Smiths in the future under the installment method. At Harold's request, Union Oil deferred the annual installment payment due on July 1, 1964. At approximately the same time, the Smiths entered into the following series of transactions with their children, Helen and Harold, Jr.: Harold and Caroline transferred their interests in the Union Oil contract to Helen and Harold, Jr. The children agreed to provide each parent with an annuity. Each child thereafter executed an instrument establishing a trust designed to fund the annuities. At about the same time Union Oil delivered a check to Harold payable to Helen and Harold, Jr., in payment of the entire outstanding balance under the installment contract. The proceeds of the check were then deposited in two savings accounts opened on behalf of the two trusts. As of the time of the trial herein, all of the payments made to Harold and Caroline under the annuity contracts have been made by the trusts.

On their joint Federal income tax return for 1964 Harold and Caroline reported no gain from the disposition of their interests in the Union Oil contract or from Union Oil's final payment of principal in respect of that contract. However, on their returns for 1964 and years subsequent, they included in gross income a portion of the annuity payments received in each year. Part of the included portion was computed by applying the method authorized by section 72, I.R.C. 1954, to the annuity payments and treating the amount includable thereunder as ordinary income. The remainder of the included portion was computed by applying the installment method authorized by section

---

[9] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(2) TOTAL CONTRACT PRICE.—For purposes of paragraph (1), the total contract price of all sales of personal property on the installment plan includes the amount of carrying charges or interest which is determined with respect to such sales and is added on the books of account of the seller to the established cash selling price of such property. This paragraph shall not apply with respect to sales of personal property under a revolving credit type plan or with respect to sales or other dispositions of property the income from which is, under subsection (b), returned on the basis and in the manner prescribed in paragraph (1).

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

453 to the portion of the annuity payments which had not been included under section 72 and treating that amount as capital gain. By reporting their gain in this manner, Harold and Caroline would not include the full amount of their gain in gross income until 1987, assuming that the guaranteed refund provisions had not yet been triggered.[10] In any event, the date would probably be much later than July 1, 1966 (which would have been the date of Union Oil's final payment if its payments had been made as originally planned), and certainly later than July 31, 1964 (when the total outstanding balance due under the contract was paid).

The Commissioner contends that Harold and Caroline should have included in their 1964 gross income that portion of their gain on the sale of the American Gas stock to Union Oil which had not yet been recognized and which had until then been deferred under the installment method. On brief he relies primarily upon section 453(d):[11]

SEC. 453. INSTALLMENT METHOD.
(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—
(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—
(A) the amount realized in the case of satisfaction at other than face value or a sale or exchange, or
(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.
Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.
(2) BASIS OF OBLIGATION.—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

The Commissioner urges that in 1964 Harold and Caroline disposed of Union Oil's installment obligation "otherwise than by sale or exchange" and that therefore, pursuant to section 453(d)(1)(B), the difference between the basis of the obligation and "the fair market value of the obligation at the time of * * * disposition" should be included in the Smiths' 1964 gross income. In the alternative, the Commissioner argues that even if the disposition were by "sale or

---

[10] Harold and Caroline reported $10,224.57 as long-term capital gain in 1964 and $30,673.70 as long-term capital gain in each subsequent year. Assuming that the annual payments in the aggregate amount of $72,000 continued, not until 1987 would they have reported a total long-term capital gain of $715,710.28.

[11] In his notice of deficiency, however, the Commissioner referred merely to sec. 453 without specifying any paragraph thereof, but the explanation in that notice would seem to indicate reliance upon par. (a) which is made applicable to this case by par. (b). The theory involving these latter provisions will be considered, *infra* pp. 291–292.

exchange," the fair market value of the annuities at the time of the disposition is ascertainable and that such amount, less the Smiths' basis in the Union Oil contract, is includable in their 1964 gross income pursuant to section 453(d) (1) (A).

Petitioners agree that section 453(d) governs their disposition of the Union Oil contract. However, they contend that the disposition was a "sale or exchange" within the meaning of section 453(d) (1) and that therefore subparagraph (A), not subparagraph (B), provides the applicable measure of the amount of gain: the difference between the basis of the obligation and "the amount realized." Petitioners urge that what was realized, the annuities, had no ascertainable fair market value in 1964 and that therefore recognition of gain was properly deferred under the combined application of sections 72 and 453.

The installment method of reporting income for Federal tax purposes was first authorized by statute in section 212(d) of the Revenue Act of 1926, 44 (pt. 2) Stat. 23. It was designed to permit recipients of certain installment payments to report their gain ratably over the period during which the installments were received and thereby avoid the hardships of "bunching" the gain in 1 year or a relatively few years, often prior to the receipt of a substantial portion of the anticipated proceeds. S. Rept. No. 52, 69th Cong., 1st Sess., p. 19 (1926); H. Rept. No. 356, 69th Cong., 1st Sess., pp. 32-33 (1926); *Burnet* v. *S. & L. Bldg. Corp.*, 288 U.S. 406, 413-414; *Nuckolls* v. *United States*, 76 F. 2d 357, 359 (C.A. 10); *Everett Pozzi*, 49 T.C. 119, 126; *Lewis M. Ludlow*, 36 T.C. 102, 107-108; *Thomas F. Prendergast, Executor*, 22 B.T.A. 1259, 1262. The effect of reporting sales proceeds under the installment method is thus deferral or postponement of much of the tax stemming from the gain on the sale. Accordingly, the installment method provisions have been customarily regarded as "relief" measures, and "exceptions" to the general tax accounting rules. Their availability has therefore been considered a "privilege" for which the statutory requirements must be strictly construed. *Everett Pozzi*, 49 T.C. 119, 127; *Cappel House Furnishing Co.* v. *United States*, 244 F. 2d 525, 529 (C.A. 6); *Blum's, Incorporated*, 17 B.T.A. 386, 389.

After the installment method became available in 1926, a number of taxpayers electing to report gain under that method subsequently disposed of their unpaid installment obligations and claimed that recognition of the gain represented by the unpaid installment obligations should continue to be deferred or should be bypassed altogether. See *Nuckolls* v. *United States*, 76 F. 2d 357, 359-360 (C.A. 10); *Nebraska Seed Co.* v. *United States*, 116 F. Supp. 740, 743-744 (Ct. Cl.), certiorari denied 347 U.S. 1012; *Hegra Note Corp.* v. *Commissioner*, 387 F. 2d 515, 517-518 (C.A. 5), affirming a Memorandum Opinion

of this Court. In response Congress enacted section 44(d) of the
Revenue Act of 1928, 45 (pt. 1) Stat. 806,[12] which was designed to
terminate the privilege of reporting gain on the installment method
where a taxpayer who had elected installment method treatment sub-
sequently disposed of unpaid installment obligations. The House and
Senate committee reports explained the objectives of the 1928 legisla-
tion in identical language (H. Rept. No. 2, 70th Cong., 1st Sess. p. 16
(1927) ; S. Rept. No. 960, 70th Cong., 1st Sess. p. 24 (1928)) :

Subsection (d) contains new provisions of law *to prevent evasion of taxes in
connection with the transmission of installment obligations* upon death, their
distribution by way of liquidating or other dividends, or their disposition *by
way of gift, or in connection with similar transactions*. The situations above
specified ordinarily do not give rise to gain and yet at the same time it is
urged that they permit the recipient to obtain a greatly increased basis in his
hands for the property received, except in the case of gifts. It therefore seems
desirable to clarify the matter. The installment basis accords the taxpayer
the privilege of deferring the reporting at the time of sale of the gain realized,
until such time as the deferred cash payments are made. *To prevent the evasion
the subsection terminates the privilege of longer deferring the profit if the seller
at any time transmits, distributes, or disposes of the installment obligations and
compels the seller at that time to report the deferred profits*. The subsection also
modifies the general rule provided in subsection (a) for the ascertainment of
the percentage of profit in the deferred payments, in those cases in which the
obligations are satisfied at other than their face value or are sold or exchanged.
The modification permits a compensating reduction in the percentage of profit
in case the obligations are satisfied at less than their face value, or are sold
or exchanged at less than face value.

Whether or not the gain or loss realized under the section is recognized for
tax purposes, depends upon general principles of law embodied in the income
tax provisions, the exchange of installment obligations in connection with tax-
free exchanges, for instance, being cared for by section 112.

[Emphasis supplied.]

The general purpose of the 1928 legislation was thus to require a
taxpayer who had elected to defer recognition of gain under the
installment method to recognize previously unrecognized gain when he
disposed of the installment obligations of the purchaser. *Nebraska Seed
Co.* v. *United States*, 116 F. Supp. 740, 744 (Ct. Cl.); *Ralph
Dessauer*, 54 T.C. 327, 330, on appeal (C.A. 8). The significant lan-
guage of the 1928 legislation has been preserved, substantially un-

---

[12] SEC. 44. INSTALLMENT BASIS.

(d) Gain or loss upon disposition of installment obligations.—If an installment obliga-
tion is satisfied at other than its face value or distributed, transmitted, sold, or otherwise
disposed of, gain or loss shall result to the extent of the difference between the basis of
the obligation and (1) in the case of satisfaction at other than face value or a sale or
exchange—the amount realized, or (2) in case of a distribution, transmission, or disposi-
tion otherwise than by sale or exchange—the fair market value of the obligation at the
time of such distribution, transmission, or disposition. The basis of the obligation shall be
the excess of the face value of the obligation over an amount equal to the income which
would be returnable were the obligation satisfied in full.

changed, in the 1954 Code. The statute provides two different standards for measuring the amount of the proceeds from the disposition of an installment obligation. One, "the amount realized," is applicable in the case of a sale or exchange or a satisfaction of the obligation at less than face value. The other, "the fair market value of the obligation at the time of distribution, transmission, or disposition," is applicable in the case of all other dispositions.

Petitioners concede that there was a "disposition" of an installment obligation in 1964 calling for the application of section 453(d)(1). However, their position—that the disposition qualifies as a "sale or exchange" under section 453(d)(1)(A), that the "amount realized" had no ascertainable value in 1964, and that therefore recognition of gain ought to be deferred beyond the period originally authorized by section 453—flies in the face of the general purpose of section 453(d): to terminate the privilege of deferred recognition on the disposition of an installment obligation.[13] And in deciding whether or not the Smiths' disposition of their interests in the Union Oil contract qualifies as a "sale or exchange," we have borne in mind the general purposes of section 453(d).[14]

We conclude that Harold and Caroline's disposition of their interests in the Union Oil contract in 1964 was a "disposition otherwise than by sale or exchange" within the meaning of section 453(d)(1)(B) and that therefore they realized gain in 1964 to the extent of the difference between the basis of the contract and its fair market value at the time of the disposition. The record makes abundantly plain that the so-called assignments did not in fact represent any bona fide "sale or exchange." Rather, the evidence convincingly shows that they were simply component elements of an overall plan which embraced the trusts as well as the annuities—a plan that merely provided for periodic payments to petitioners during their lifetimes to be made out of the proceeds of the Union Oil contract, followed by disposition of the remainder to their children or other objects of their bounty, all in accord

---

[13] Of course, as indicated by the final paragraph of the committee reports quoted above, statutory nonrecognition provisions (e.g., in the case of corporate reorganizations) may in some cases authorize nonrecognition of gain described by sec. 453. See regs. secs. 1.453–9(a) and 1.453–9(c) ; *Nebraska Seed Co.* v. *United States*, 116 F. Supp. 740, 742–743 (Ct. Cl.), certiorari denied, 347 U.S. 1012. No such provision has been called to our attention that is applicable here.

[14] Cf. *Heqra Note Corp.*, 25 T.C.M. 479, 486, P–H. Memo. 66–538, 66–546, affirmed 387 F. 2d 515 (C.A. 5) :

"If installment notes were transferred for so nebulous a right that nothing with an ascertainable fair market value might be said to have been received therefor, it would be questionable whether an exchange as distinguished from other disposition of the notes had occurred within the meaning of section 453(d)(1). The clear import of the statute is that upon disposition in any manner of installment obligations, other than certain tax free exchanges, the portion of the gain deferred when the installment method of reporting the gain was elected which has not previously been included in income becomes includable therein."

with a carefully preconceived and integrated "estate plan," prepared, conducted, and dominated by Harold and his advisers. Among other materials in the record we take particular note of the following.

In April of 1964, Harold seriously considered and nearly accepted a proposal which generally paralleled the plan he adopted some 2 months later. That he did not accept this proposal appears to have stemmed from his uneasiness about its promoter, and not from any objection he had to the basic elements of the scheme. Thus, from the outset, the assignments, annuities, and trusts were all regarded as interdependent components of a prearranged plan.

By instruments dated June 30, 1964, Harold and Caroline purported to assign their interests in the Union Oil contract to Helen and Harold, Jr., and by instruments dated July 1, 1964, the children in return purported to undertake to furnish their parents with annuities. The annuity contracts were unsecured, notwithstanding a number of considerations which made the absence of collateral or security extremely risky: Helen was then a college student, with little interest in financial affairs and no significant financial resources of her own apart from her interest in the Union Oil contract; she was a minor, only 19 years old, no guardianship was established through which her liability might have been fixed, and she could have disavowed her "obligation" upon attaining her majority; Harold, Jr., was then about to graduate from Air Force flight school and was expected to remain in the Air Force for 4 more years; neither child had prior experience with investment and management of capital or with annuities; and neither expected to be in a position in the near future to manage the assets which had been assigned or to fulfill the annuity obligations out of assets other than those assigned.

Harold and Caroline requested Union Oil to defer the installment payment otherwise due on July 1, 1964, because the planned series of transactions had not been consummated at that time. Not until July 31, 1964, when the trust instruments were ready for the children's signatures, did Harold receive the deferred payment from Union Oil. We note that it was to Harold that Union Oil delivered the check, notwithstanding the fact that it was payable to Helen and Harold, Jr. Plainly, it was he with whom Union Oil dealt. Immediately thereafter Harold personally brought the check to Helen and Harold, Jr., and had each child endorse the check at approximately the same time that each executed the appropriate trust instrument. Then Harold (not one of his children) mailed the check to Voegelin who deposited the proceeds in the trust accounts. Neither of the children appears to have had any control over the check or the proceeds therefrom for any period of time.

Furthermore, notwithstanding that the annuity contracts required payments to begin as of August 1, 1964, they did not in fact commence until September 1 of that year because the trusts had not been established by August 1. Although the failure to make the August 1 payments may perhaps be characterized as a mere detail which petitioners contend was "overlooked," it is a detail of great significance in the context of this case. If the obligations of the children to pay the annuities were bona fide personal obligations that were assumed in exchange for the Union Oil contract, the August 1 payments required by the specific terms of the annuity contracts should have been made regardless of the establishment of the trusts. Such August payments were substantial ($6,000 in the aggregate), and the casual manner in which the failure to make those payments was accepted makes it all too plain that no real personal obligation was ever intended to be imposed upon the children. To the contrary, we are convinced that the annuities and the trusts represented in substantial part merely an attempted gradual payout to petitioners of the proceeds of the Union Oil contract over a period of years, comparable to the "technically elegant arrangement" referred to in *Griffiths* v. *Commissioner*, 308 U.S. 355, 357, which was described as having been "devised" by a "lawyer's ingenuity." There was no bona fide "sale or exchange" here.

Throughout the roles played by Helen and Harold, Jr., were passive. They were kept informed of the plan as it developed, but the record reveals only peripheral participation in planning and no semblance of arm's-length bargaining prior to the time the plan was carried out. Although completely inexperienced in such matters, the children retained no counsel of their own and relied simply on the advice of Voegelin and Samuelson, who had planned the entire scheme on behalf of their parents. Moreover, the record discloses no participation by the children in the arrangement after the trusts had been established. Indeed, the record strongly suggests that their daily lives were largely unaffected by the entire affair. If the trusts for any reason had been unable or had failed at any time to make the annuity payments we have no doubt that the parents would not have taken any steps against the children to require them personally to make the payments. We think that no such personal liability was in fact intended, and the actions (or nonaction) of the parties in respect of the August 1, 1964, payments speak much louder to us in this connection than the testimony of Harold, Jr., who indicated that he felt personally bound by the instruments which he signed.

Similarly, the series of transactions has caused remarkably little change in the position of Harold and Caroline with regard to their wealth. The trustees selected to manage the investment of the proceeds of the Union Oil contract were Voegelin and Samuelson, the same

persons who had been advising the Smiths over the years in the management of their affairs. The use of the irrevocable trust device simply carried out Harold's estate plan to ensure himself and his wife of adequate incomes for the remainder of their lives, to attempt to minimize estate taxes, to avoid the responsibilities of managing his family's financial affairs, and to ensure that his children would be well taken care of particularly after he and his wife had passed on. The trusts accomplished these purposes, and they clearly reflect the intentions and desires of the parents, rather than those of the children, who appear in form as settlors. Thus, after the death of both parents, the entire corpus and accumulated income of Harold, Jr.'s trust were to be distributed to him upon his becoming 40 years of age; in contrast, no such provisions permitted like terminal distributions to Helen at any time out of her trust. In his testimony before us Harold referred to this situation as "the way *we* wanted it"—i.e., to Harold, Jr., "after a certain period of time," but in the case of Helen, who was then unmarried, "*we* did not know who she was going to marry, or if he would try to get everything away from her" (emphasis supplied). Obviously, the trusts represent the parents' disposition of *their* own property in accordance with *their* own desires and do not reflect dispositions made by the children. Confirmation of this conclusion, if confirmation were thought to be necessary, may be found not only in the fact that the contingent beneficiaries were persons or institutions in which the parents, rather than the children, had some particular interest, but also in the further fact that Harold had made similar dispositions in a will which he had theretofore executed. Moreover, we are fully satisfied that the highly restrictive nature of the special powers purportedly reserved to Harold, Jr., and Helen in paragraph Fourth of their respective trusts reflect the will of the parents rather than that of the children; we do not believe that the children would have tied their own hands so early in life in respect of their control over the remainder interests, particularly where no tax advantage would appear to accrue to them in thus limiting their power to dispose of the remainder interests. The true explanation lies, of course, in the fact that Harold, Jr., and Helen were not the real settlors of these trusts, and that the provisions in question carry out the will of their parents rather than their own desires.

It is our conclusion that the children were but passive intermediaries in a circuitous scheme, that although they were settlors in form the true settlors were the parents themselves, and that this case presents a peculiarly apt occasion to apply the oft-quoted language of *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613: "A given result at the end of a straight path is not made a different result because reached by following a devious path." That the true settlor of a trust

may be someone other than the one, who appears in form as the settlor has been well established in a long line of cases beginning at least as far back as *Lehman* v. *Commissioner*, 109 F. 2d 99 (C.A. 2), certiorari denied 310 U.S. 637, which finally received the stamp of approval by the Supreme Court in *United States* v. *Estate of Grace*, 395 U.S. 316. Although those cases frequently involved the reciprocal trust device, the central point is substantially the same, and the same principles have been considered applicable in a wide variety of other situations. Cf., e.g., *Estate of Dora N. Marshall*, 51 T.C. 696, 700–702; *Estate of Grace D. Sinclaire*, 13 T.C. 742, 746; *Estate of Cornelia B. Schwartz*, 9 T.C. 229, 237–239; *Estate of George W. Hall*, 6 T.C. 933, 939.[15] Throughout this line of cases is the underlying concept, articulated in 2 Scott, Trusts, sec. 156.3, pp. 1201–1202 (3d ed. 1967), that "A person who furnishes the consideration for the creation of a trust is the settlor, even though in form the trust is created by another person." Cf. Restatement, Trusts 2d, sec. 156, comment *f* at p. 327 (1959). And as we evaluate the evidence in the record before us the parents in fact furnished the assets that became the corpora of the trusts. That central fact is not to be obscured by the intervening formalism of separate transfers and annuity contracts. Those steps were but component parts of a single, integrated transaction, in which the parents must be regarded as the real settlors of the trusts.

Petitioners' contention that they fulfilled legitimate estate-planning purposes and that there was thus no "sham" or absence of "business purpose" is beside the point. Of course, we accept the view that petitioners engaged in "estate planning"; indeed, that is basic to our decision. The point is that *they* were the real settlors in attempting to achieve such purpose, and that the use of the annuity device coupled with trusts intended to pay the annuities serves only to camouflage the true nature of the transaction. In form there may have been a sale or exchange; in susbtance there was none.

Petitioners have placed considerable reliance upon *Gladys Cheesman Evans*, 30 T.C. 798. Whatever may be thought of the Court's evaluation of the evidence before it in that case, our conclusion in the pres-

---

[15] The cited cases were decided under the estate tax provisions of the internal revenue laws. Petitioners urge that such decisions have little relevance to a case arising under the income tax provisions. We disagree. While the "language and considerations ingrained in the gift and estate tax statutes" do not impede us in deciding questions under certain income tax provisions, cf. *United States* v. *Davis*, 370 U.S. 65, 69, fn. 6, we should hardly be reluctant to look to them for guidance where we think them relevant. See, e.g., *Samuel* v. *Commissioner*, 306 F. 2d 682, 688–689 (C.A. 1), affirming 36 T.C. 641. This is particularly true when relying upon a doctrine of such general applicability as that of "substance over form." Compare *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 265–267; *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334; *Griffiths* v. *Commissioner*, 308 U.S. 355; *Higgins* v. *Smith*, 308 U.S. 473; *Gregory* v. *Helvering*, 293 U.S. 465, with *United States* v. *Estate of Grace*, 395 U.S. 316, 321–325; *Lehman* v. *Commissioner*, 109 F. 2d 99, 100 (C.A. 2), certiorari denied 310 U.S. 637, and *Estate of Dora N. Marshall*, 51 T.C. 696, 701–702.

ent case rests upon our appraisal of the evidence now before us. And on that evidence we do not find that the children were given the Union Oil contract free and clear, to do with it as they pleased, merely in consideration of their unsecured promises to pay annuities. To the contrary, we find that the creation of the trusts, which carried out the *parents'* estate plan, not that of the children, was an integral and indispensable part of the transaction. When the smoke cleared away all that really remained (except for formal individual promises of the children to pay the annuities which we have found were not intended to be binding) were two trusts in which the parents provided for themselves during their lifetimes with appropriate provisions also taking care of their children and certain contingent beneficiaries who were the objects of their bounty.

Although we sustain the Government's position argued on brief that the deficiency may be supported under section 453(d)(1)(B) as opposed to petitioners' contention that there was a "sale or exchange" of the installment obligation under section 453(d)(1)(A) in return for annuities which had no ascertainable fair market value in 1964,[16] we think that the 1964 deficiency determined against the Smiths may be approved upon the more fundamental ground set forth in the notice of deficiency. [17] See p. 281, *supra.* In that notice, the Commissioner determined that the 1964 payment made by Union Oil to petitioners' assignees (Harold, Jr., and Helen) was "actually received by you in 1964 within the meaning of section 453." While that determination did not specify any particular paragraph of section 453, it obviously referred to paragraph (a) which is made applicable to this case by paragraph (b)(1)(B). See fn. 9, *supra* p. 282.

The various materials in the record which support the Government's position on brief in respect of section 453(d)(1)(B) furnish even greater support to the theory of the deficiency notice that the funds paid by Union Oil in 1964 were actually received by the parents, or at the very least were paid out at their direction. If we accept the Govern-

---

[16] The Commissioner has urged in the alternative that even if there were a "sale or exchange" of an installment obligation, the annuities had an ascertainable fair market value at the time of the exchange and that such amount, less the Smiths' basis in the Union Oil contract, is includable in their 1964 gross income pursuant to sec. 453(d)(1)(A). However, in view of our disposition of the case, we do not reach this contention.

[17] Indeed, even if this ground had not been set forth in the notice of deficiency it would still be open to us to base our decision upon it, for, as we recognized in *Wilkes-Barre Carriage Co.,* 39 T.C. 839, 845–846, affirmed 332 F. 2d 421 (C.A. 2), "the rule is well established that a deficiency may be approved on the basis of reasons other than those relied upon by the Commissioner or even where his reasons may be incorrect. *Blansett* v. *United States,* 283 F. 2d 474, 478–479 (C.A. 8) ; *Bernstein* v. *Commissioner,* 267 F. 2d 879, 881–882 (C.A. 5) ; *Acer Realty Co.* v. *Commissioner,* 132 F. 2d 512, 514–515 (C.A. 8) ; *Alexander Sprunt & Son* v. *Commissioner,* 64 F. 2d 424, 427 (C.A. 4) ; *Crowell* v. *Commissioner,* 62 F. 2d 51, 53 (C.A. 6) ; *J. & O. Altschul Tobacco Co.* v. *Commissioner,* 42 F. 2d 609, 610 (C.A. 5) ; *Hughes* v. *Commissioner,* 38 F. 2d 755, 757 (C.A. 10) ; *John I. Chipley,* 25 B.T.A. 1103, 1106 ; *Edgar M. Carnrick,* 21 B.T.A. 12, 21 ; cf. *Helvering* v. *Rankin,* 295 U.S. 123, 132–133."

ment's argument, as we have, that the various steps involved were but component parts of a single transaction, the conclusion is irresistable that the Union Oil payment, although made in form to the children, was in fact made to the parents, who became the true settlers of the trusts before us. The children were merely intermediaries in the transaction. In that view of the record, the parents must be treated as having actually received payment in full of the outstanding installment obligation in 1964, and they therefore must account in 1964 for the remaining unreported gain then realized on the installment sale of their stock.[18]

2. The second issue for decision is whether, pursuant to section 163.[19] Helen may deduct $18,396 as interest paid to her parents in 1967 under her annuity contracts with them. Each contract made the following provision for "interest":

It is mutually understood and agreed by and between the parties to this Annuity Contract that the interest factor in this contract shall be equal to that amount of any payments made to HAROLD W. SMITH [CAROLINE H. SMITH] pursuant to the terms hereof which is required by applicable Federal Income Tax laws to be included in the taxable income of HAROLD W. SMITH [CAROLINE H. SMITH] as ordinary income. It is further understood that this interest factor as so stated shall be in lieu of any other provision or requirements for interest payments on the part of the promisor.

Helen, of course, did not make the "interest" payments herself. The monthly payments were made, purportedly on her behalf, by the Helen Caroline Smith Trust. Although she has not spelled it out, Helen apparently claims the deduction on the theory that since she has included all of the trust's income in her gross income under the "grantor trust" provisions of the Code, deductible expenditures made by the trust on her behalf are similarly attributable to her.

Her contention is adequately answered by our disposition of the first issue in this case. The claimed interest expenditures purportedly represent interest payments on the deferred purchase price paid for one-half of her parents' interests in the Union Oil contract. But while the

---

[18] Petitioners have contended that they may not be charged with either actual or constructive receipt of Union Oil's payment of July 31, 1964, on the ground that *prior to that date* they had assigned their entire interest in the purchase agreement to their children. Cf. *Blair v. Commissioner,* 300 U.S. 5. However, as we indicated in our Findings of Fact, the record before us does not clearly establish the precise chronology of the transactions which occurred between late June and early August of 1964. The burden of proof is upon the petitioners and in our judgment they have failed to establish by satisfying evidence just when the so-called assignments were executed in relation to the payment by Union Oil, or in any event in relation to the accrual of the right to receive the July 1 installment. Cf. *Helvering v. Horst,* 311 U.S. 112; *Helvering v. Eubank,* 311 U.S. 122. More fundamentally, *Blair v. Commissioner* is of no assistance to petitioners simply because petitioners did not make genuine assignments of their rights under the Union Oil contract but in substance retained control over it and its proceeds.

[19] SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

transaction was cast in the form of a sale, in substance no sale occurred. Helen was but a passive intermediary in a complex scheme whereby her parents retained income interests in the proceeds of the Union Oil contract. Interest, within the meaning of section 163, has been defined to be compensation for the use of borrowed funds or for postponing collection of funds otherwise due. See *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552, 560; *Deputy* v. *DuPont*, 308 U.S. 488, 497–498; *Autenreith* v. *Commissioner*, 115 F. 2d 856, 858 (C.A. 3). Yet Helen neither borrowed from her parents nor deferred the payment of funds owed to them; her parents simply retained income interests in assets which they held from the outset. There was consequently no necessity for Helen to make interest payments to them.

Indeed, in substance, Helen made no payments of any kind to her parents. The sole source of the payments to them was, as intended, the trust and its assets, the proceeds of the Union Oil contract. Of course, one-half of her parents' interests in the contract were formally "assigned" to Helen before they were placed in trust. But the assignments were simply part of a circuitous scheme whereby the proceeds were placed in trust on behalf of the parents, not on behalf of Helen. We conclude, therefore, that Helen made no interest payments to her parents and that she is not entitled to the claimed deduction.[20]

*Decisions will be entered under Rule 50.*

[20] In view of our conclusion that Helen is not entitled to the claimed interest deduction, it would seem to follow that she should not be charged with any income from the trust. No such issue has been raised, but if a motion to amend the pleadings in this respect should be filed, we would be inclined to give favorable consideration to it in order that the deficiency may be computed on a consistent theory.