LEWIS M. LUDLOW AND HARRIET M. LUDLOW, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77570. Filed April 18, 1961.

*Endicott Peabody, Esq.*, and *Kingsbury Browne, Jr., Esq.*, for the petitioners.

*Douglas D. Robertson, Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent determined a deficiency in the petitioners' income tax for 1955 in the amount of $23,154.16. The only issue is whether the petitioners are entitled to report the income from the sale of certain shares of stock in 1955 on the installment basis within the meaning of section 453 of the Internal Revenue Code of 1954.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are hereby incorporated by this reference.

Lewis M. Ludlow and Harriet M. Ludlow, husband and wife, are residents of Parkersburg, West Virginia. They filed a joint income tax return for 1955 with the district director of internal revenue for the district of West Virginia. Lewis will hereinafter be called the petitioner.

Petitioner was a director, stockholder, and treasurer of the Pattin Manufacturing Company (hereinafter called Pattin), a West Virginia corporation with its offices and principal place of business in Marietta, Ohio. On December 29, 1955, the outstanding stock of Pattin was owned as follows:

| Shareholder | Number of shares |
|---|---|
| Petitioner | 63 |
| Latrobe Company | 55 |
| Devonshire Company | 50 |
| Karl L. Elliott | 16 |
| J. B. Dempsey | 15 |
| Fred Shriver | 10 |
| Robert B. McDougle | 1 |
| Total | 210 |

Sometime in October 1955 the Eastern Malleable Iron Company of Naugatuck, Connecticut, hereinafter called Eastern Malleable, made proposals to the officers and stockholders of Pattin to purchase all of the stock in Pattin for $1,260,000, with part of the purchase price in cash and part in deferred payments. The offer was to purchase not less than all and the division of the purchase price, or the price per share, was to be left up to the seven shareholders. There were some negotiations amongst the shareholders as to the price per share they would accept with the small shareholders wanting a higher price per share than the large shareholders. On November 4, 1955, Robert B. McDougle was given a power of attorney by petitioner to act for him in future negotiations and to accept not less than $5,333.33 a share for his 63 shares. John Wells Farley, an attorney in Boston, owned or controlled the Devonshire and Latrobe Companies. He had been a business associate and close friend of petitioner's for 30 years and petitioner instructed McDougle to do whatever Farley agreed to do; that he would go along with whatever Farley did with the Devonshire and Latrobe Companies' stock.

In the further negotiations with Eastern Malleable there was a tentative understanding among the seven shareholders of Pattin as to the price per share each would accept if Eastern Malleable's offer to buy all of the stock was accepted. McDougle and Farley, representing petitioner, and Latrobe and Devonshire Companies were to receive $5,400 a share, and the remaining shareholders larger sums per share.

On December 1, 1955, representatives of Eastern Malleable met with McDougle and the other individual stockholders of Pattin. Eastern Malleable offered $1,260,000 for all of Pattin's shares with $600,000 to be paid in cash and $660,000 in deferred payments over a 10-year period. During this meeting McDougle communicated by telephone with Farley who was then in a hospital. Farley said he was willing to sell if the cash payment were divided between 1955 and 1956 to

permit qualification of the transactions as installment sales under section 453 of the Internal Revenue Code of 1954. McDougle then informed the representatives of Eastern Malleable that he, representing petitioner, and Farley, representing the Devonshire and Latrobe Companies, would sell their stock on the basis of $5,400 a share, provided that part of the offer consisting of cash ($600,000) was so divided that they would not receive more than 30 percent in 1955 and the balance in 1956 so that the sales could qualify as installment sales for tax purposes. Since Eastern Malleable had no business interest in how the $600,000 cash was paid, tentative acceptance of Eastern Malleable's offer was reached.

The parties met for further negotiations on December 5, 1955, in Farley's law office in Boston. At this meeting many of the other provisions of the sales contract were negotiated and Eastern Malleable announced it would form a wholly owned subsidiary, the Bruger Corporation, which would buy the Pattin stock. At the end of this day-long meeting a draft of the sales contract was dictated. This draft recited the stockholders of Pattin agreed to sell their stock in Pattin for the following amounts:

| Stockholder | Shares | Price per share | Total price |
|---|---|---|---|
| Petitioner | 63 | $5,400.00 | $340,200 |
| Latrobe Company | 55 | 5,400.00 | 297,000 |
| Devonshire Company | 50 | 5,400.00 | 270,000 |
| Karl L. Elliott | 16 | 8,012.50 | 128,200 |
| J. B. Dempsey | 15 | 8,186.66⅔ | 122,800 |
| Fred Shriver | 10 | 9,580.00 | 95,800 |
| Robert B. McDougle | 1 | 6,000.00 | 6,000 |
| | 210 | | 1,260,000 |

The clauses with respect to the amounts to be paid in cash in 1955 and 1956 were left blank to be filled in that evening by Elliott who was to compute the division so that each stockholder received 29 percent of his share of the cash payment in 1955 and the balance January 5, 1956. Elliott's computation which he inserted in the draft was as follows:

| Stockholder | Cash payment | | Notes |
|---|---|---|---|
| | On or before Dec. 31, 1955 | Jan. 5, 1956 | |
| Petitioner | $109,620 | $70,380.00 | $160,200.00 |
| Latrobe Company | 95,700 | 61,442.86 | 139,857.14 |
| Devonshire Company | 87,000 | 55,857.15 | 127,142.85 |
| Karl L. Elliott | 27,840 | 17,874.27 | 82,485.73 |
| J. B. Dempsey | 26,100 | 16,757.15 | 79,942.85 |
| Fred Shriver | 17,400 | 11,171.43 | 67,228.57 |
| Robert B. McDougle | 1,740 | 1,117.14 | 3,142.86 |
| | 365,400 | 234,600.00 | 660,000.00 |

Elliott computed the 29 percent cash payment to be made in 1955 to each stockholder erroneously, in that he failed to take into consideration the fact that the price per share was not uniform.

The following table illustrates the result of Elliott's computation:

| Seller | Total price | 1955 cash payment as shown by written instrument | Percent of column 3 to column 2 |
|---|---|---|---|
| Petitioner | $340, 200 | $109, 620 | 32. 22 |
| Latrobe Co | 297, 000 | 95, 700 | 32. 22 |
| Devonshire Co | 270, 000 | 87, 000 | 32. 22 |
| Elliott | 128, 200 | 27, 840 | 21. 71 |
| Dempsey | 122, 800 | 26, 100 | 21. 25 |
| Shriver | 95, 800 | 17, 400 | 18. 16 |
| McDougle | 6, 000 | 1, 740 | 29. 00 |
| | 1, 260, 000 | 365, 400 | 29. 00 |

The next meeting was the day of the closing on December 29, 1955, when the sales agreement containing Elliott's erroneous computation that he had placed in the December 5 draft, was executed. Eastern Malleable delivered checks in accordance with this computation.

On December 30, 1955, the bookkeeper for the Devonshire and Latrobe Companies noticed the amounts of the checks for Devonshire and Latrobe Companies' stock exceeded 30 percent of the total sales prices for said stock. She immediately notified McFarland, who was Farley's law partner. McFarland, on the same day, called Gager, the secretary of and attorney for the buyer corporation in Waterbury, Connecticut, and explained that the amounts paid the petitioner and the Devonshire and Latrobe Companies were in excess of the amounts agreed upon, and he proposed to rectify the error by arranging to have amounts of money wired to the buyer through a Boston bank which would result in having the Latrobe and Devonshire Companies having less than 30 percent of their sales prices in 1955. He also told Gager he was going to get in touch with McDougle for petitioner since he was in the same situation and point out the error to him. Gager expressed his willingness to receive the payments and regretted that there had been an error.

On the same day McFarland, on behalf of the Latrobe and Devonshire Companies, had the First National Bank of Boston wire to the Bruger Corporation the amounts of $6,700 and $6,500, respectively. McDougle, petitioner's representative, was then in New York and McFarland did not reach him by telephone until late in the afternoon of December 30. McDougle, when advised of the error, telephoned to his Parkersburg law office and arranged to have $8,500 sent by Western Union to the Bruger Corporation upon behalf of petitioner. It is stipulated the money was wired on behalf of petitioner to the buyer's bank for the buyer's account and that the money was received

by Western Union on Saturday, December 31, 1955. The bank in Naugatuck was closed on Saturday and McDougle's partner was so notified. He directed delivery to Gager but Gager could not be located that day. The money was not delivered until Sunday, January 1, 1956, when it was delivered directly to Gager.

On January 5, 1956, the Bruger Corporation mailed a check, dated January 5, 1956, to the petitioner in the amount of $78,880. This represented the amount of $70,380 which was specified in the sales agreement as due on January 5, 1956, together with the $8,500 which the petitioner had returned to the Bruger Corporation a few days earlier.

Petitioner in the joint income tax return filed with his wife for 1955 reported the gain from the sale of his stock on the installment method. Respondent included the entire gain from the sale as a long-term capital gain for 1955.

#### OPINION.

The question here is whether petitioner's income representing gains from the sale of his Pattin stock in 1955 qualifies for treatment on the installment basis under section 453, I.R.C. 1954.[1] Respondent, in his notice of deficiency, determined the sale "does not qualify under section 453 of the Internal Revenue Code of 1954 for reporting the gain therefrom by the installment method, since you received in excess of thirty percent of the selling price during said taxable year."

The sales contract executed on December 29, 1955, provided for payment to petitioner in 1955 in excess of 30 percent of the selling price of the stock. Petitioner received on that date, pursuant to the written contract, the sum of $109,620, which is about 32.22 percent of the total sales price of $340,200.

Petitioner argues the true agreement and real understanding between the parties establishes an intention to have the 1955 payment

---

[1] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

less than 30 percent of the total sales price so that the sale could qualify as an installment sale; that the provision in the sales contract providing for a 1955 payment of $109,620 was an error in computation in the original draft that was inadvertently carried over into the executed contract; and that the error was recognized and admitted by the parties and the contract effectively reformed by them and the overpayment sent back to the buyer before the close of 1955.

We agree that it was petitioner's intention to sell his stock so that the 1955 payment to him would be less than 30 percent of the total sales price so that the sale could qualify as an installment sale; that Elliott's computation which was inserted in the contract was in error;[2] that it was not in accord with the understanding of either the buyer or the seller as to the cash payment to be made to petitioner in 1955. It is also true the buyer had no business purpose, or any interest, or concern, in dividing the cash payment it was to make ($365,400) between the years 1955 and 1956.

Once the price was agreed upon the purchaser had but little interest in the clauses that divided the cash he was to pay between the closing days of the year of sale and the early days of the next year. But here, as in so many stock sales transactions, these clauses were, because of tax consequences, of vital interest to the sellers. The buyer of the stock knew they were important to the sellers and it fairly appears from the record the buyer probably would not have been able to purchase the stock on any arrangement that would spread half of the purchase price over 10 years, without an agreement that would qualify the sellers for installment reporting.[3]

No "taint" of tax avoidance is to be attached to this transaction merely because the buyer was at all times willing to pay more than 30 percent of the selling price in the year of sale and the seller was insisting on a payment of no more than that percent so that he could report his gain on the installment basis. This was a transaction which would take 10 years to complete. The very purpose of section 453 is to allow a taxpayer to avoid the bunching of income especially where the income is to be derived from a transaction which will take

---

[2] What Elliott did was to multiply the total selling price, $1,260,000 by 29 percent to get the total cash payment to all of the stockholders in 1955 or $365,400. He then divided the $365,400 by the total number of shares sold, 210, which gave him an answer of $1,740 and he multiplied this sum by the number of shares held by each stockholder to obtain each stockholder's share of the downpayment. His method would have resulted in 29 percent to each shareholder if they all received the same price per share. Since they did not the result he reached was more than 29 percent for those who received the lowest price per share.

[3] Petitioner's basis for all of his Pattin stock was $32,100. He was agreeing to sell it in 1955 for a total price of $340,200, largely payable in installments over a 10-year period. His income tax return for 1955 shows adjusted gross income (exclusive of gain on the sale of Pattin stock) of over $16,000. Respondent's adjustment added over $151,000 to petitioner's 1955 taxable income.

a substantial time to complete.[4]  In *James Hammond*, 1 T.C. 198, we observed with respect to the antecedent statute of section 453 (sec. 44, I.R.C. 1939) :

There can be no quarrel with the fundamental principle * * * that Congress by section 44 has granted taxpayers the right to elect to sell property on the installment basis and thereby reduce their tax liability, even though they could have sold for immediate cash payment. * * *

Indeed the statute and the Commissioner's regulations thereunder allow for installment reporting when the transaction merely extends into a year after the year of sale if other conditions are met.  Sec. 1.453-1(c), Income Tax Regs.  It is not necessary for the sale to conform to the popular conception of an installment sale with a contract calling for the payment of the purchase price in fixed installments, for the casual seller to return income on the installment basis.  *E. M. Funsten*, 44 B.T.A. 1166.

The requirements of the statute are met if there is no payment to the seller in the year of sale or if the payment that year does not exceed 30 percent of the total sales price, and this total sales price exceeds $1,000.[5]  Here the sole question is whether there was *payment* within the meaning of the statute in the year of sale in excess of 30 percent.  Respondent argues we can look no further than the provisions of the sales contract calling for payment in 1955 in the sum of $109,620 and the check in the amount of $109,620 delivered to petitioner thereunder; that in such circumstances the sum of $109,620 constitutes the *payment* in the year of sale within the meaning of the statute and what petitioner did with the money or part of it after he received it is immaterial; and, since $109,620 exceeds 30 percent of petitioner's entire selling price of $340,200, he is not entitled to report his gain on the installment basis.

Petitioner argues the word "payment" in the statute is measured by the true obligation between the buyer and the seller and any amount received by the seller in excess of that obligation is not properly includible in the term "payment," as that term is used in the statute.

We think there is merit in petitioner's contention.  The requirement of the statute is linked to the word "payments" in the year of sale—not the payment requirements recited in a sales contract.  The word "pay-

---

[4] In *Thomas F. Prendergast, Executor*, 22 B.T.A. 1259, we said:

"The method of reporting income on the installment basis was enacted by Congress as a relief provision.  The chief idea which motivated Congress in allowing the installment method of reporting income was to enable a merchant to actually realize the profit arising out of each installment before the tax was paid.  In other words, the tax could be paid from the proceeds collected rather than be advanced by the taxpayer.  Had not this relief provision been enacted, it would have undoubtedly worked hardship where the merchant had his profit deferred upon the installment plan beyond the installment period. * * *"

[5] The Commissioner's regulations with respect to the use of the installment method of reporting gains from casual sales merely recite the statutory limitations on the use of the installment method.  Sec. 1.453-1(c), Income Tax Regs.

ments" in this statute which deals with purchase and sale transactions means the performance of the consideration provisions in accordance with the parties' true agreement. Thus in *E. M. Funsten, supra* (decided under the 1939 Code when some initial payment was necessary to qualify), the sale of stock was accomplished by the buyer giving his note payable on or before 5 years from date, with a provision therein that dividends were to be applied in payment. We held since a dividend was both contemplated and paid in the year of sale, the dividend was an initial payment qualifying the seller to report on the installment basis. The parties to a sales contract are not bound by the erroneous recitation of the debt obligation in the sales contract. It is their true agreement as to the 1955 payment that measures the debt and the money received in excess of the 1955 obligation is not "payment," as that term is used in the statute.

The word "payment" as it is used in section 453 was squarely in issue in *James D. Boone*, 27 B.T.A. 1064. There the written contract of sale of coal properties called for a selling price of $550,000 with a downpayment in the year of sale of $150,000 (in excess of the then statutory ceiling in the installment statute of 25 percent). We said "those recitals are not necessarily conclusive" and held under the evidence sellers' "only agreement was to sell the property for $500,000, of which $100,000 was to be paid in cash." Since $150,000 was paid to the sellers and $50,000 immediately refunded to the buyer we held "the initial payment did not exceed one-fourth of the purchase price and the transaction falls within the statutory definition of an installment sale."

In *First Savings & Trust Co., Executor*, 20 B.T.A. 272, we held the true selling price of land was $108,000 of which $23,000 was paid in the taxable year. Actually the sale was, at the buyer's request, recorded on the seller's books as being for $120,000 with a downpayment of $35,000. Though the $35,000 was paid to the seller he immediately refunded $12,000, partly to the buyer and partly to an option holder. We held that $23,000 was the initial payment in the year of sale which was less than one-fourth of the total sale price and the seller could report on the installment basis.

Respondent, on brief, mentions the fact that the $8,500, though delivered to the telegraph company in 1955, did not reach the buyer until January 1, 1956, but he makes no argument based on that fact.[6] His position, as stated in his brief, is "that it makes no difference what petitioner did with the payment he received in 1955 subsequent to

---

[6] In *Blum's Incorporated*, 7 B.T.A. 737, no question of the refund of an initial payment is involved but there is exhaustive treatment of a dealer's method of reporting installment income. There we held installment payments received and refunded in the same year should be excluded from the total installment payments before computing the proportion thereof to be returned as income.

having received it because he received it under a valid claim of right without restriction." The short answer to this contention is that our finding that the written contract was erroneous means the seller received the excess over 30 percent under a mistake, mutually recognized, and not under a claim of right. It is sufficient here that this excess was not includible as payment under section 453. The fact that petitioner did in 1955 send the excess back to the buyer and the buyer accepted same supports his contention that the written contract was erroneous.

We hold that the payment received by the petitioner in 1955 did not exceed 30 percent of his selling price for the 63 shares of stock, and that he is entitled to report his gain from such sale under the installment method within the meaning of section 453, I.R.C. 1954.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

Murdock, *J.*, dissenting: Section 453 provides that a casual sale of personal property for a price exceeding $1,000 may be returned on an installment sale basis. But section 453(b)(2) provides a limitation that the above shall apply in the case of a sale such as here took place "only if in the taxable year of the sale * * * the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price." The transaction here was carried out in exact accordance with the written agreement, but the amounts received by the petitioners and two others in accordance with the express terms of that contract exceeded 30 percent of their shares of the total price. The amount of cash actually received by the petitioners in 1955 was $7,560 in excess of 30 percent of their share of the total purchase price. The entire amount received by the petitioners in 1955 was paid and received as a part of the purchase price. No one disputed the petitioners' right to keep all of it and they could have kept all of it, had they so desired. Section 453 contains no reference to what the parties intended as to when portions of the purchase price were to be paid but makes the installment sale benefits depend solely upon the payments that were actually made in the taxable year. Thus, as to these sellers, this was not an installment sale within the precise words of section 453.

The petitioners' representative attempted unsuccessfully to deliver $8,500 to the purchaser during the short time remaining in 1955. However, I do not think it would make any difference if this effort had been successful and if the efforts had been at the express direction of the petitioners, as to which there is no evidence.

Turner and Train, *JJ.*, agree with this dissent.