ESTATE OF HELEN A. MEREDITH, DECEASED, TRAVIS C. MEREDITH, EXECUTOR, ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Estate of Meredith v. Commissioner
Docket Nos. 2871-78, 2872-78, 2876-78, 2877-78, 3175-78.
United States Tax Court
T.C. Memo 1981-72; 1981 Tax Ct. Memo LEXIS 666; 41 T.C.M. (CCH) 923; T.C.M. (RIA) 81072; February 23, 1981. Russell J. Horn and Frank L. Scofield, for the for *667 the petitioners. William T. Overton, the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax, along with additions to such tax as provided for in sections 6651(a) and 6653(a), Internal Revenue Code of 1954, [2] for the following taxable years in the following amounts: Taxable Year
Additions to Tax,
I.R.C. 1954
Petitioner
Ending
Deficiency
Sec. 6651(a)
Sec. 6653(a)
Helen A.
Meredith,
Deceased
12/31/72
$ 15,319.59
$ 3,819.00
$765.98
12/31/74
299.87
0
0
Travis
Meredith,
Deceased
12/31/72
5,701.73
1,425.43
285.09
12/31/74
299.87
74.97
14.99
12/31/75
285.00
71.25
14.25
Travis C.
Meredith
12/31/72
51,934.60
0
2,596.73
12/31/74
2,043.20
0
102.16
12/31/75
1,968.83
0
98.44
Law
Publications,
Inc.
3/31/73
15,457.95
0
0
3/31/75
443.68
0
0
3/31/76
486.91
0
0
Meredith
Properties,
Inc.,
No. One
12/31/72
13,244.83
3,311.21
662.24
12/31/74
710.13
177.53
35.51
12/31/75
674.09
168.52
33.70
*668 After concessions, the only issues remaining for our decision are: (1) whether the gains realized from sales in 1972 of real property owned by the petitioners were properly reported as installment sales under section 453; [3]
(2) whether any or all of the petitioners in docket Nos. 2871-78, 2872-78, or 3175-78 are liable for the failure to file penalty levied in section 6651(a); and (3) whether any or all of the petitioners in docket Nos. 2871-78, 2872-78, 2876-78, or 3175-78 are liable for the negligence penalty levied in section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The petitioner in docket No. 2871-78 is Travis C. Meredith in his capacity as executor of the estate of his mother, Helen A. Meredith, who died on May 30, 1977. HelenA. *669 Meredith did not file a Federal income tax return for her taxable year 1972. She filed a Federal income tax return for her taxable year 1974 with the Director, Internal Revenue Service Center, Austin, Texas. The petitioner in docket No. 2872-78 is Travis C. Meredith in his capacity as administrator of the estate of his father, Travis Meredith, who died on September 5, 1976. Travis Meredith did not file Federal income tax returns for his taxable years 1972, 1974, and 1975. The petitioner in docket No. 2876-78 is Travis C. Meredith, who resided in San Antonio, Texas, at the time each of the petitions in this consolidated proceeding was filed. Travis C. Meredith filed individual Federal income tax returns for his taxable years 1972, 1974, and 1975 with the Director, Internal Revenue Service Center, Austin, Texas. The petitioner in docket No. 2877-78 is Law Publications, Inc., a corporation organized under the laws of the State of Texas and having, at all times here relevant, its principal office in Austin, Texas. At all relevant times, all of the outstanding common stock of Law Publications, Inc., as owned by Arthur Mitchell (herein Mitchell). Law Publications, Inc.,filed *670 its Federal corporate income tax returns for its taxable years ending March 31 of 1973, 1975, and 1976, with the Director, Internal Revenue Service Center, Austin, Texas. The petitioner in docket No. 3175-78 is Meredith Properties, Inc., No. One (herein Meredith, Inc.), a corporation organized under the laws of the State of Texas and having, at all times here relevant, its principal office in San Antonio, Texas. Meredith, Inc. did not file Federal corporate income tax returns for its taxable years ending December 31 of 1972, 1974, and 1975. During each of the years in issue, Travis C. Meredith served as president of Meredith, Inc. Since 1962, James G. LeBlanc (herein LeBlanc), an experienced accountant, had advised Travis Meredith, Helen A. Meredith, Travis C. Meredith, and Meredith, Inc. in tax matters. He would either prepare Federal income tax returns for these four petitioners or advise them they need not file such returns. Though these petitioners had, in 1972, 1974, and 1975, interest income in excess of the minimum income amount which necessitated, for those return years, the filing of Federal income tax returns, he advised Helen (1972), Travis (1972, 1974 and 1975), *671 and Meredith, Inc. (1972, 1974, and 1975) not to file returns for the indicated taxable years. As to Meredith,Inc., LeBlanc believed that such corporation had forfeited its corporate charter by 1972 and, thus, was not a tax-paying entity. Pursuant to a contract of sale executed on May 8, 1972, the two petitioner corporations and seven related individuals, including Travis C. Meredith, sold and conveyed to two other individuals, Herman F. Waters, Jr. (herein Waters), and S. Gary Roberts (Roberts), a 1,120.308-acre tract of land situated in Bexar County, Texas (herein the 1,120-acre tract), for $ 560,154.06, or $ 500 per acre. Meredith, Inc. owned 100 of the 1,120 acres; Travis C. Mereidth owned a three-eighths interest, and Law Publications, Inc., owned a one-eighth interest, in the remainder of the 1,120-acre tract. The remaining interests in the 1,120-acre tract were owned by six non-petitioner relatives of Travis C. Meredith, all of whom were, along with Travis C. Meredith and Travis Meredith, heirs of J.C. Meredith, the original owner of the 1,120-acre tract. On the same date, pursuant to the same contract of sale, Helen A. Meredith, who separately owned a 183.398-acre tract *672 of land adjoining the 1,120-acre tract (herein the 183-acre tract), sold and conveyed such tract to Waters and Roberts for $ 91,699, or $ 500 per acre. The 1,120-acre tract and the 183-acre tract were sold under nearly identical terms, in the same transaction, and to the same buyers. Except where necessary, we will hereinafter refer to the two tracts in the aggregate as the Meredith properties, and we will treat the two transactions as one. The consideration paid by Waters and Roberts for the 1,120-acre tract was an executed promissory note in a face amount equal to the entire purchase price of such tract, $ 560,154.06. No principal payments on such note were paid or required to be paid during 1972. Though prepaid interest on the note of $ 39,210.78 was paid upon closing in 1972, no portion of the total purchase price of the 1,120-acre tract was paid in 1972. Similarly, the consideration paid for the 183-acre tract consisted solely of an executed promissory note in a face amount equal to the entire purchase price of such tract, $ 91,699. No principal payments on such note were paid or required to be paid in 1972. Though $ 6,418.93 of prepaid interest on the note was paid *673 upon closing in 1972, no portion of the total purchase price of the 183-acre tract was paid in 1972. The Meredith properties were conveyed by using a warranty deed with vendor's lien retained. The promissory notes utilized by Waters and Roberts were further secured by deeds of trust on the respective tracts. Both notes were non-recourse. The essential payment terms of the two notes were as follows: This note is due and payable as follows: Interest on this obligation has been prepaid through October 1, 1973. Interest thereafter shall be paid annually with the first of said annual interest installments to be due and payable on October 1, 1974 and a like installment due on the 1st day of October of each year thereafter until the principal has been paid in full. The principal of this note shall be due and payable on the 1st day of October, 1997. This note however, may be prepaid in part on the following basis: Between October 1, 1977 and October 1, 1978, 25% of the principal maybe prepaid; between October 1, 1978 and October 1, 1979, 25% of the original principal may be prepaid; between October 1, 1979 and October 1, 1980, 25% of the original principal may be prepaid and between *674 October 1, 1980 and October 1, 1981, 25% of the original principal may be prepaid. On or after October 1, 1981, the remaining principal, if any, may be prepaid in full. Furthermore, each promissory note contained (or incorporated by reference to other documents) provisions which allowed Waters and Roberts to obtain releases of the liens on the Meredith properties by substituting collateral therefor. The following provisions controlled the substitution of collateral privilege with regard to the 1,120-acretract transaction: In the event the makers hereof avail themselves of the opportunity of making substitution of collateral, as provided for in the deed of trust hereinabove referred to, the interest rate of 7% as hereinabove set forth shall be modified. Starting with October 1, 1972 and subsequent thereto, the dollar amount of this note represented by dollars in certificates of deposit shall bear interest at the same rate as the rate of the certificates of deposit. All remaining portions of this note shall continue to bear interest at 7%. This adjustment of interest rate shall be applicable each time the certificates of deposit are increased. Ifat any time the total certificates *675 of deposit equal the remaining principal amount of this note, the full interest rate applicable to this note shall be the interest rate applicable on the certificates of deposit. [Promissory Note.] By the acceptance of this deed of trust the HOLDER here now expressly agrees to the execution of partial releases of the vendor's lien and this deed of trust lien on the following basis: Any land to be released shall be released by releasing the entire portion of the tracts as surveyed and identified in the attached field notes. For a release of Tracts I, II,III, III-A, IV, V and V-A, the dollar amount required is and shall be the sum of $ 625.00 per acre for each acre in the tract to be released. As to Tract VI, the amount of money to be paid for a release shall be $ 750.00 per acre. No partial release will be executed for less than all the land in the tract to be released. There is no necessity for released tracts to be contiguous to each other. If at any time the GRANTOR desires to obtain partial releases of the vendor's lien and this deed of trust lien, in lieu of making payments on the note, he shall obtain certificates of deposit issued by a bank or banks mutually approved *676 by the GRANTOR and HOLDER, and shall pledge said certificates of deposit to the HOLDER in exchange for HOLDER executing the partial releases. It is distinctly understood and agreed that the certificates of deposit shall stand in lieu of the land and the interest earned thereon shall be the property of GRANTOR, but such interest earnings shall be and are herenow pledged to HOLDER to guarantee the payment of the interest installments provided for in said note. In the event of such substitution of collateral, the interest payments called for on the note shall be made as called for. It is clearly agreed that the interest earned on the certificates of deposit may be used for the payment of interest on the note. At any time certificates of deposit are substituted for the land as collateral, the interest rate of 7% provided for in the note secured by this deed of trust shall be changed to the rate of interest set forth on the face of the certificates of deposit, but only as to the amount represented by dollars in certificates of deposit. All unpaid portions of the note secured by this deed of trust not represented by dollars in certificates of deposit shall continue to bear interest at *677 7%. Such certificates of deposit, if any, may be cashed in to the extent necessary to provide funds for the prepayment of the note according to the prepayment schedule set forth in the note itself, namely, 25% of the original principal amount annually starting on and subsequent to October 1, 1977. On October 1, 1981, all remaining certificates of deposit, if any, shall be cashed in and the proceeds applied on the note. In the event the total funds from the certificates of deposit are in excess of the outstanding balance on the note, the excess shall be refunded to GRANTOR herein. [Deed of Trust.] This substitution of collateral contract shall terminate the 1st day of October, 1981. All assets on hand, if any, as of October 1, 1981, shall be transferred to Third Party to the extent necessary to pay the note in full, the excess, if any, being refunded to First Party. But further provided in the event the deed of trust hereinabove referred to is foreclosed upon and at that time there has been a substitution of collateral, simultaneously with the foreclosure, the substitution of collateral agreement shall terminate and any funds on hand for previously partial releases shall be *678 immediately transferred to the Third Party. [Substitution of Collateral Agreement.] The following provisions controlled the substitution privilege with regard to the 183-acre tract: In the event the makers hereof avail themselves of the opportunity of making substitution of collateral as provided for in the deed of trust hereinabove referred to, the interest rate of 7% on this note shall be changed as of the date of the substitution of collateral to the interest rate set forth on the certificates of deposit substituted for the land as collateral on this note. [Promissory note.] If the GRANTORS desire to obtain a full release of the vendor's lien and deed of trust lien on or prior to the 1st day of October, 1981, in lieu of making payments on the note, they shall obtain certificates of deposit in the combined total amount of $ 91,699.00, issued by a bank or banks mutually approved by GRANTORS and HOLDER, and shall pledge said certificates of deposit with a national bank mutually acceptable to GRANTORS and HOLDER for the benefit of the HOLDER in exchange for HOLDER executing a full release. The interest rate of 7% on the note shall be changed as of the date of the certificates *679 of deposit to the interest rate set forth on said certificates of deposit. It is distinctly understood and agreed that the certificates of deposit shall stand in lieu of the land and the interest earned thereon shall be the property of the GRANTORS, but such interest earnings shall be and are herenow pledged to HOLDER to guarantee the payment of the interest installments provided for in said note. In the event of such substitution of collateral, the interest payments called for on the note shall be made as called for. On or after October 1, 1977, such certificates of deposit, if any, may be cashed in to the extent necessary to provide funds for the prepayment of the note according to the prepayment schedule set forth in the note, itself, namely 25% of the original principal amount annually starting on or subsequent to October 1, 1977. On October 1, 1981, all remaining certificates of deposit, if any, shall be cashed in and the proceeds applied on the note. In the event the total funds from the certificates of deposit are in excess of the outstanding balance on the note, the excess shall be refunded to GRANTORS herein. [Deed of Trust.] The owners of the Meredith properties had *680 been trying to sell the properties since 1960. These efforts were aimed at a contract for a down payment of 20 to 25 percent, with the balance to be paid in installments over a period of time. Such owners wanted an installment sale in order to provide them with long-term income. When the owners of the Meredith properties were negotiating a sales agreement with Waters and Roberts, they made them the same type offer they had been making in previous attempts to sell the property; i.e., they intended to structure the transaction as an installment sale. All parties to the transaction knew that Waters and Roberts intended to resell the Meredith properties, probably after subdividing them, which intention provided the motivation for the inclusion of the substitution of collateral and prepayment provisions in the documents controlling the October 1, 1972, transactions. On July 17, 1973, Waters and Roberts sold the Meredith properties to Elbert S. Cox and W.L. Bates (herein Cox and Bates) for a total purchase price of $ 976,779.50. Waters and Roberts continued to manage the Meredith properties after they sold them to Cox and Bates.
Waters and Roberts never obtained releases of lien *681 on the Meredith properties by substituting collateral, and they never exercised their right, in whole or in part, to prepay the two notes executed on October 1, 1972. On December 30, 1961, as part of a program for building an outer loop road system around the City of San Antonio, the County Commissioners' Court of Bexar County, Texas, authorized the acquisition of right-of-way for widening a road that passed through the1,120-acre tract. This authorization was contained in an order appropriating certain bond funds of Road District Number One if bonds were authorized at an election to be held on January 27, 1962. The bond election was held and the issuing of bonds was authorized by the results of that election. Six years later, on February 8, 1968, Travis C. Meredith was approached by a right-of-way purchasing agent for Bexar County with regard to a proposed acquisition of 5.209 acres of the 1,120-acre tract (herein the proposed right-of-way tract), which acreage was to be used as right-of-way for the projected outer loop. The agent made an offer that Travis C. Meredith thought was too low. After contacting his attorney and co-owner of the property, Mitchell, who agreed that *682 the price the agent was offering was too low, Travis C. Meredith asked the agent for an offer in writing. The agent brought Travis C. Meredith a letter offering $ 3,700 for the proposed right-of-way tract. The offer was rejected, and the agent said that the County was going to have the property reappraised and that he would get back to them later. During the negotiations leading to the October 1, 1972, sale of the Meredith properties, all parties to the sale were aware that the Meredith properties were being sought by Bexar County.The parties agreed that any proceeds received upon the condemnation of (or any proceeds from the sale of) the proposed right-of-way tract would be applied to the outstanding principal of the promissory note executed with regard to the sale of the 1,120-acre tract. However, such agreement was merely oral and was not incorporated into any of the documents executed by the parties to the sale of the 1,120-acre tract. Although the parties to such sale thought that the sale or condemnation of the proposed right-of-way tract would take place in a couple of years, they had no evidence or assurance of when, if ever, such sale or condemnation would take place. *683 Furthermore, Cox and Bates, the owners of the Meredith properties when the proposed right-of-way tract was actually sold, were not aware of or bound by this above-mentioned agreement regarding the application of the proceeds of any condemnation or sale of such tract. In June of 1974, Bexar County purchased the proposed right-of-way tract from Cox and Bates for $ 7,825. Such amount was received by the National Bank of Commerce of San Antonio (the nominal payee of the promissory note executed in favor of the owners of the 1,120-acre tract by Waters and Roberts) in July of 1974 and applied to the principal of the promissory note executed in favor of the owners of the 1,120-acre tract on October 1, 1972. The Commissioner determined deficiencies in petitioners' Federal income tax, as set forth above, based upon his contention that the sales of the Meredith properties did not qualify for installment sale treatment under section 453. He further determined, as specified, additions to tax for failure to timely file Federal income tax returns and for negligence.
OPINION Issue 1. Installment Sale
Petitioners, along with the remaining owners of the Meredith properties, sold two *684 tracts of land to Waters and Roberts on October 1, 1972, receiving as the total purchase price promissory notes of face amounts equal to the total purchase price of each tract. No principal payments on such notes were due until 1997, though interest was payable annually and the first year's interest was prepaid. Because the purchasers contemplated reselling the tracts, either as a whole or after subdividing them, the notes and attendant deeds of trust allowed them to obtain partial releases of the vendor's and deed of trust liens on certain parts of the two tracts by substituting as collateral certificates of deposit in place of the land for which they wished to obtain the lien releases. This privilege was to terminate on October 1, 1981. Furthermore, on and after October 1, 1977, Waters and Roberts could, for each of the next four years, prepay up to 25 percent of the original principal amount of such notes, either by outright payment thereof or by applying any certificates of deposit previously substituted against such principal amount. Any certificates of deposit not so applied by October 1, 1981, were tobe so applied on that date. After October 1, 1981, the remaining principal *685 amounts of the notes could be prepaid at any time. In summary, the purchasers had an optional right to substitute collateral and obtain the attendant lien releases from the inception of the notes until October 1, 1981; furthermore, they had the optional right to prepay no more than25 percent of the principal amount of each note in each of four years beginning with October 1, 1977, as well as an optional right to completely prepay the note at any time on or after October 1, 1981. The only payment required under the terms of the two notes was the final payment, which was due on October 1, 1997. The parties to these two notes also had an oral understanding that any proceeds from the possible future sale or condemnation of a portion of the 1,120-acre tract (which portion had been the subject of some prior, unfruitful negotiations between the owners thereof and Bexar County) would be applied to the principal of the note executed in connection with the sale of the 1,120-acre tract. The duo that purchased the Meredith properties on October 1, 1972, Waters and Roberts, sold them intact to Cox and Bates on July 17, 1973. There is no evidence that Cox and Bateswere aware of the oral *686 understanding between the parties to the initial sale regarding the application of any proceeds from the sale or condemnation of the proposed right-of-way tract. Such tract was sold to Bexar County in June of 1974, and the proceeds were applied to the outstanding principal of the note executed upon the sale of the 1,120-acre tract. There is no evidence that Waters and Roberts ever availed themselves of the substitution of collateral privilege provided in the two notes. Furthermore, there is no evidence that they ever made any payments on the principal amount of such notes. Petitioners treated the transaction as one qualifying for installment sale treatment under section 453 and, therefore, having received no installment payments in their respective taxable years which included October 1, 1972, reported no gain from the sale of the Meredith properties for such taxable years. Respondent asserts that the sale of the Meredith properties did not come within the ambit of the ameliorative provisions of section 453. Section 453, as in effect for the taxable years before us, [4] provided in pertinent part as follows: *687 SEC. 453.INSTALLMENT METHOD. (a) DEALERS IN PERSONAL PROPERTY.-- (1) IN GENERAL.--Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.
(2) TOTAL CONTRACT PRICE.--For purposes of paragraph (1), the total contract price of all sales of personal property on the installment plan includes the amount of carrying charges or interest which is determined with respect to such sales and is added on the books of account of the seller to the established cash selling price of such property. Thisparagraph shall not apply with respect to sales of personal property under a revolving credit type plan or with respect to sales or other dispositions of property the income from which is, under subsection (b), returned on the basis and in the manner prescribed in paragraph *688 (1). (b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.-- (1) GENERAL RULE.--Income from-- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding$ 1,000, may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) LIMITATION.--Paragraph (1) shall apply-- (A) In the case of a sale or other disposition during a taxable year beginning after December 31,1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition-- (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. (B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the *689 income was (by reason of section 44(b) of the Internal Revenue Code of 1939) returnable on the basis and in the manner prescribed in section 44(a) of such code. (3) PURCHASER EVIDENCES OF INDEBTEDNESS PAYABLE ON DEMAND OR READILY TRADABLE.--In applying this subsection, a bond or other evidence of indebtedness which is payable on demand, or which is issued by a corporation or a government or political subdivision thereof (A) with interest coupons attached or in registered form (other than one in registered form which the taxpayer establishes will not be readily tradable in an established securities market), or (B) in any other form designed to render such bond or other evidence of indebtedness readily tradable in an established securities market, shall not be treated as an evidence of indebtedness of the purchaser. Admittedly, petitioners have not breached the limitations found in section 453(b)(2). However, respondent asserts that petitioners are definitionally excluded from using section 453 because their disposition of the Meredith properties was not "on the installment plan," i.e. *690 , the sale was not under a plan which, by its terms and conditions, contemplated that the sale would be paid for in two or more payments. It cannot now be questioned that, in order to qualify for installment sale treatment, two or more payments must be specifically and unconditionally called for. McCutcheon & Co. v. Commissioner,30 B.T.A. 1177 (1934); Prendergast, Executorv. Commissioner,22 B.T.A. 1259 (1931); Baltimore Baseball Club, Inc. v. United States,202 Ct.Cl. 481, 481 F.2d 1283 (1973); Treas. Reg. 1.453-2(b)(1). This requirement is fully applicable to casual sales of realty. 10-42 Corp. v. Commissioner,55 T.C. 593 (1971). The question we must decide is whether the sales of the Meredith properties were under plans which, by their terms and conditions, specifically and unconditionally called for more than one payment. Clearly, they were not. There were no payments in the year of sale. The promissory notes required only one principal payment [5] on each note--the final payment, which was due in 1997. Admittedly, other payments were possible and even probable under *691 the prepayment provisions of the controlling documents, but such payments were not "specifically and unconditionally provided for." McCutcheon,supra at 1182. Thus, the mere existence of the pre-payment and substitution of collateral provisions, without a binding promise by Waters and Roberts to actuallymake a payment other than the final payment, does not lead to the conclusion that the Meredith properties were disposed of on "the installment plan." Similarly, the facts surrounding the potential application of proceeds from the possible sale or condemnation of the proposed right-of-way tract do not prove that a payment other than the final payment was unconditionally called for. We must, of course, look to the actual final agreement of the parties to the sale in order to determine whether such agreement calls for an installment sale. Tombari v. Commissioner,299 F.2d 889 (9th Cir. 1962); Ludlow v. Commissioner,36 T.C. 102 (1961). [6]Assuming, arguendo, that the oral *692 agreement regarding the potential use of such proceeds does not violate the parolevidence rule, and, therefore, that such agreement is a part of the bargain which we must examine, we still do not find an agreement unconditionally calling for a second payment. The sale or condemnation of the proposed right-of-way tract was a condition to the hoped-for principal payment. Waters and Roberts were neither required to sell, nor were they assured that Bexar County would condemn, the proposed right-of-way tract prior to October 1, 1997. The existence of a condition precedent to the agreed-upon payment, the happening of which was not guaranteed by the terms of the agreement, makes any payment that is conditional thereon "conditional" for our purposes. Compare Funsten v. Commissioner, 44B.T.A. 1166 (1941), in which the seller promised that the conditional event (the declaration of dividends from which the initial year's payment was to be made), over which he, as president of the relevant corporation, had substantial control, would actually occur. Cf. Gilbert v. Commissioner,25 T.C. 81 (1955). *693 The other cases petitioners cite in support of their argument are readily distinguishable. Wagegro Corp. v. Commissioner,38 B.T.A. 1225 (1938), clearly provided for installment payments, while Ludlow,supra, involved a mutual mistake of fact as to what actual dollar amount was to be paid in order to avoid violating the "30 percent in the year sale" test. Therefore, since neither of the agreements of the parties to the 1972 sales of the Meredith properties specifically and unconditionally called for more than one payment, the sales of the Meredith properties did not qualify for installment sale treatment under section 453. Issue 2. Failure to File Penalty
Helen A. Meredith did not file a Federal income tax return for her taxable year 1972. Travis Meredith did not file Federal income tax returns for his taxable years 1972, 1974 and 1975. Meredith, Inc. did not file Federal corporate income tax returns for its taxable years 1972, 1974 and 1975. The Commissioner determined additions to the tax of these taxpayers for these taxable years under section 6651(a), which provides, as here relevant: *694 SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) ADDITION TO THE TAX.--In case of failure--
(1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate. These petitioners do not deny that they failed to file the required returns, or that such failure was erroneous. However, they contend that such failure was due to reasonable cause, i.e.,that they relied on *695 LeBlanc, their accountant, who advised them not to file returns for those years. The taxpayer has the burden of proving that his failure to file was due to reasonable cause and not to willful neglect. Lee v. Commissioner,227 F.2d 181 (5th Cir. 1955), cert. denied 351 U.S.982 (1956); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners herein have failed to carry that burden. Respondent does not claim that the non-filing petitioners were willfully neglectful in failing to file the required returns, but rather contends that such failure was not due to reasonable cause. Reasonable cause has been defined to mean the exercise by a taxpayer of ordinary business care and prudence. Southeastern Finance Co. v. Commissioner,153 F.2d 205 (5th Cir. 1946). Advice not to file a return by competent counsel who has access to all of a taxpayer's records constitutes reasonable cause. Burton Swartz Land Corp. v. Commissioner,198 F.2d 558 (5th Cir. 1952), affg. in part and revg. in part a Memorandum Opinion of this Court.
Petitioners *696 allege that they come within this latter-stated explication of reasonable cause, i.e., that they relied on LeBlanc, that he was a fully informed, competent adviser, and that he advised them not to file the missing returns. However, aside from his erroneous advice concerning the installment sale treatment of the sales of the Meredith properties, it is stipulated that the non-filing petitioners had interest income in excess of the minimum amount which triggers the need to file returns. Either LeBlanc had access to the appropriate information and grievously erred in his analysis of the appropriateness of filing the returns, in which case he obviously does not have the required degree of competence, or, more likely, he did not have access to all of the relevant information, in which case he was not fully informed. In either case, according to the above cited standard, his advice would not be the type upon which petitioners could rely in asserting reasonable cause. Thus, respondent's imposition of the penalties pursuant to section 6651(a) is sustained. [7]
*697 Issue 3. Negligence Penalty
In the amounts and for the petitioners indicated above, the Commissioner determined additions to tax under section 6653(a) which provides: SEC. 6653. FAILURE TO PAY TAX. (a) NEGLIGENCE OR INTENTIONAL DISTREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. Petitioners have the burden not only of proving non-negligence but also of proving that they did not intentionally disregard rules and regulations. Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967), affg. a Memorandum Opinion of this Court, cert. denied 389 U.S. 1044 (1968). They have not only *698 failed to address or carry this burden, but, if the burden were on respondent, we would find affirmatively that the petitioners against whom this penalty was assessed did intentionally disregard respondent's regulations. See Treas. Reg. 1.453-2(b). The asserted additions to tax under section 6653(a) are sustained. Decisions will be entered for the respondent in docket Nos. 2871-78, 2876-78, 2877-78, and 3175-78.
Decision will be entered under Rule 155 in docket No. 2872-78.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of Travis Meredith,Deceased, Travis C. Meredith, Administrator, Docket No. 2872-78; Travis C. Meredith, docket No. 2876-78; Law Publications, Inc., docket No. 2877-78; and Meredith Properties, Inc.,No. One, docket No. 3175-78.↩
2. All section references are to the Internal Revenue Code of 1954, as amended.↩
3. Respondent conceded this issue in docket No. 2872-78. However,because the petitioner in that case conceded other adjustments that result in a net deficiency for its taxable year 1972, we must still determine whether such petitioner is liable for the section 6651(a) and section 6653(a)↩ additions to tax.
4. All of the petitioners except Law Publications, Inc., are calendar year taxpayers; thus, their relevant taxable year (for purposes of this issue) is 1972. Law Publications, Inc., reports on a fiscal year ending March 31, thus, its relevant taxable year (for purposes of this issue) is the taxable year ending March 31, 1973.↩
5. Payments of interest only do not constitute "payments" for these purposes. See McCutcheon v. Commissioner,30 B.T.A. 1177↩ (1934).
6. Turner v. Commissioner,T.C. Memo. 1974-264↩.
7. Petitioners presented no evidence that Meredith, Inc.'s corporate charter had lapsed, or that it had ceased doing business.↩